**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 25 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PEGGY I. ALLISON,

      Plaintiff-Appellant,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

      Defendant-Appellee.

No. 03-5052

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 01-CV-207-P)**

---

Joseph F. Clark, Jr., Tulsa, Oklahoma for Appellant.

Thayla Painter Bohn (with John R. Woodard, III on the brief), Feldman, Franden, Woodard Farris & Bourdreaux, Tulsa, Oklahoma for Appellee.

---

Before **HENRY** , **HOLLOWAY** , and **O'BRIEN** , Circuit Judges.

---

**HENRY,** Circuit Judge.

---

      Peggy Allison challenges the decision by UNUM's claims administrator to deny long-term disability benefits under her employer's group disability plan.

Ms. Allison suffers from multiple endocrine neoplasia type I (MEN-I syndrome), a relatively uncommon inherited disease that often causes overactivity and enlargement of certain endocrine glands, including the parathyroid and the pancreas.

After conducting a pre-existing condition review, UNUM denied Ms. Allison long-term disability benefits and rejected Ms. Allison's appeal. Ms. Allison sought further review, claiming that UNUM had miscalculated the date of her eligibility for benefits as February 1, 1998, rather than January 1, 1998. UNUM admitted the error and re-opened the pre-existing condition examination. During this process, UNUM requested additional medical information from Ms. Allison. After several failed attempts to obtain this information from Ms. Allison's then-counsel, UNUM again denied her claim for benefits, citing its inability to complete the pre-existing condition review.

Ms. Allison brought a civil suit under 29 U.S.C. § 1132(a)(1)(B), alleging that she was entitled to disability benefits under the plan. She also alleged insurance bad faith under Oklahoma law. Additionally, she sought federal common law consequential and punitive damages for the wrongful denial of benefits; she has subsequently abandoned this claim.

The district court granted UNUM's motion for partial summary judgment, finding that the bad faith claim was preempted by ERISA. As to the §

1132(a)(1)(B) claim, UNUM admitted a conflict of interest, as both payor and administrator of the plan. After receipt of trial briefs, the district court applied the arbitrary and capricious standard of review, found in favor of UNUM, and dismissed Ms. Allison's remaining claim.

Exercising jurisdiction under 28 U.S.C. § 1291, we hold that (1) the district court did not apply the appropriate standard of review when it considered the plan administrator's denial of benefits to Ms. Allison; (2) notwithstanding this error, the district court's dismissal of Ms. Allison's § 1132(a)(1)(B) claim was correct because UNUM has established by substantial evidence that its denial of benefits, based on Ms. Allison's failure to present proof of her claim, was reasonable; and (3) the district court correctly found that ERISA preempts Ms. Allison's bad faith claim.

## I. BACKGROUND

### A. Factual History

In March 1997, Ms. Allison began working for the Sapulpa Herald, a subsidiary of Community Newspaper Holdings, Inc. Ms. Allison's benefits under the employee health insurance policy and the group disability policy became effective on January 1, 1998. The policy, under a provision entitled "What disabilities are not covered under your plan?" states: "Your plan does not cover

any disabilities caused by, contributed to by, or resulting from your . . . pre-existing condition." Aplt's Supl. App. vol. II, at 48.

The policy provides the following details regarding a pre-existing condition:

> You have a pre-existing condition if:
>
> - you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 6 months just prior to your effective date of coverage; or you had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 6 months just prior to your effective date of coverage; and
>
> - the disability begins in the first 24 months after your effective date of coverage unless you have been **treatment free** for 12 consecutive months after your effective date of coverage.

Id. at 48. The Plan also requires a claimant to supply a proof of claim and/or proof of continuing disability:

> In some cases, you will be required to give UNUM authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability. UNUM will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

Id. at 32.

The parties agree that Ms. Allison is completely disabled as a result of MEN-I. Ms. Allison contends that she first sought medical help from Dr. Donald

-4-

Johnson for her condition on January 30, 1998. Aplt's Br. at 3. Dr. Johnson's notes described Ms. Allison's prior medical history: "Two years ago had a parathyroid adenoma surgically removed. She had a hysterectomy in July of 1980 for carcinoma in situ." Aplt's Supl. App. vol. II, at 155.

Dr. Johnson referred Ms. Allison to Dr. Thomas Schiller for an endoscopy. Dr. Schiller diagnosed Ms. Allison as suffering from chronic gastritis. He noted that "she has a history of ulcer disease and has been previously diagnosed as having MEA1." *Id.* at 153 (Consultation Report dated February 3, 1998). MEA1 is the abbreviation for Multiple Endocrine Adenomatosis, also referred to as MEN-I.

One entry in her medical records dated March 24, 1999, indicated Ms. Allison suffered from "years of nausea and heartburn" and "multiple benign tumors." *Id.* at 234. On June 25, 1999, Ms. Allison completed a short-term disability claim, stating that her "pancreas has tumors on it, nothing can be done." *Id.* at 265 (Disability Claim, dated June 25, 1999). She indicated that she "hadn't ever been treated before" for this condition, she experienced "bad pain" and had been suffering from similar symptoms "all [her] life," and that she was "[a]dvised that [her] condition would only get worse." *Id.* She indicated her last date of work was May 31, 1999. *Id.* She also stated she never had the "same or a similar condition in the past." *Id.* UNUM documented the diagnosis as "pancreatic

cancer" and approved Ms. Allison's claim for short-term benefits. *Id.* at 281, 287-88.

Later records indicated she had "at least ten tumors," *id.* at 143; "multiple small tumors;" *id.* at 167; 219 (Physician's Statement, dated August 19, 1999, noting "pancreatic tumors"); and that surgery was not recommended. *Id.* at 143, 167. Subsequent reports determined there "was no clearly demonstrable pancreatic lesion," but another lesion was visible and a biopsy established it was not malignant. *See id.* at 165. According to her long-term disability (LTD) claim, she had been suffering problems related to this condition, specifically severe dyspepsia (heartburn) since February 1998. *See id.* at 215 (Long Term Disability Claim, Employee's Statement, dated May 31, 1999). The LTD claim made no further mention of the tumors.

Because the condition occurred during the first 24 months of coverage, and because Ms. Allison had not been "treatment free" for the first twelve months of coverage, UNUM undertook a pre-existing condition review to determine whether or not Ms. Allison had received medical treatment for this condition for the six months prior to the Plan's effective date. Ms. Allison signed the requested authorization forms, and supplied the name of Dr. Johnson on a "Supplemental Information Questionnaire." As requested, Ms. Allison provided the names of

several additional doctors and facilities who treated her condition, all of whom were seen after Ms. Allison's coverage began in 1998.

UNUM's Pre-existing Condition Medical Review dated November 7, 1999, performed by Disability Specialist Pyper Green, noted that Ms. Allison's disabling conditions (noted as "Pancreatic Cancer" "MEN syndrome" and "Hepatitis C") were neither "caused by, contributed [to] by or resulted from" the conditions for which Ms. Allison sought treatment on January 30, and February 4, 1998, namely "[g]astritis, weakness, bronchitis, anorexi[a], [and] severe dyspepsia." *Id.* at 118. Ms. Green's review concluded that there was "[n]o evidence of treatment for related problems during the dates in question of 8-1-97 to 1-31-98." *Id.* at 118.

In spite of this conclusion, on December 16, 1999, UNUM, in a letter signed by Ms. Green, denied Ms. Allison LTD benefits, stating that Ms. Allison was "treated by Dr. Johnson on 1/30/98 for a condition which caused, contributed to or resulted in the condition for which [she is] now claiming disability." *Id.* at 95.

Ms. Allison sought a review of the denial of benefits. On March 30, 2000, after a review of the denial of benefits, UNUM concluded the denial was proper. UNUM cited the January 30, 1998 visit to Dr. Johnson as having "fall[en] within the pre-existing time period of August 1, 1997 to February 1, 1998." *Id.* at 81.

UNUM's "medical department reviewed the file and concluded that Ms. Allison's loss of work capacity is due to abdominal pain which began in January 1998 and progressively worsened to the point where she was no longer able to work." *Id.*

During the subsequent appeal, Ms. Allison's counsel pointed out UNUM's error in determining Ms. Allison's eligibility for benefits: UNUM had inadvertently determined that Ms. Allison's eligibility for benefits began February 1, 1998, rather than January 1, 1998. Three months after acknowledgment of the error, on October 5, 2000, Matthew Roop, UNUM's Senior Appeals Specialist, indicated he had completed an "initial review" of Ms. Allison's appeal. *Id.* at 69. He requested a list of all the physicians and all facilities from whom Ms. Allison received treatment since January 1, 1996. Mr. Roop also enclosed a blank medical release authorization, identical to the one previously completed by Ms. Allison.

When Mr. Roop did not receive a response to his inquiry, he attempted to contact Ms. Allison's attorney, Jeff Belote, leaving several messages. Mr. Roop did speak with Mr. Belote on November 28, 2000, and was assured the requested information was in the mail. The requested information was not received by UNUM, and Mr. Roop attempted several follow-up calls. Mr. Roop's log indicates he attempted to contact Mr. Belote nine times over a two-month period.

On January 4, 2001, Mr. Roop wrote Mr. Belote, stating that the appeal was denied. *See id.* at 62. Mr. Roop cited Ms. Allison's failure to provide proof of her claim as required by the Plan, and stated that UNUM did not receive the relevant records needed to complete the evaluation. *See id.* at 63. Mr. Roop gave Mr. Belote thirty additional days in which to submit the requested information before the denial of benefits would become final. *See id.* Mr. Belote did not respond.

**B. Procedural History**

Ms. Allison filed suit in federal district court alleging (1) UNUM violated 29 U.S.C. § 1132 in denying her claim for benefits, (2) bad faith breach of contract, and (3) violation of federal common law. She has since abandoned the federal common law claim.

UNUM filed a motion for partial summary judgment, arguing that Ms. Allison's claim for disability benefits was governed exclusively by ERISA and that all state common law claims were expressly and impliedly preempted by ERISA. UNUM also sought to have the district court determine that the arbitrary and capricious standard of review applied to the denial of benefits and that such review was limited to the administrative record before UNUM at the time it made its benefits decision.

The district court ordered briefing and dismissed the bad faith claim in a minute order on December 4, 2002. In that order, the court also determined that it would apply the arbitrary and capricious standard of review to UNUM's denial of benefits. After receiving trial briefs and further supplemental briefing, the district court found that UNUM's decision to deny Ms. Allison's claims for benefits was not arbitrary and capricious based upon the administrative record.

## II. ANALYSIS

UNUM's long-term disability plan is governed by ERISA, 29 U.S.C. § 1001 *et seq.* In seeking coverage under her long-term disability benefit plan, Ms. Allison contends that (1) the district court erred by using the wrong standard of review when it reviewed the plan administrator's denial of benefits, but that even under the incorrect arbitrary and capricious standard, the denial of benefits was unreasonable, (2) UNUM denied her benefits without any evidence of a pre-existing condition; and (3) the denial of benefits was in bad faith under Oklahoma law, and that this claim is not preempted by ERISA.

### A. Denial of Long Term Disability Benefits

#### 1. Standard of Review

Like the district court, we must review UNUM's decision to deny benefits to Ms. Allison, and we must determine the appropriate standard to be applied.

"[A] denial of benefits challenged under § 1132(a)(1)(B) [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). There is no dispute that here the plan expressly gives UNUM, as plan administrator, the discretion to determine whether to deny a claimant insurance benefits under the plan. Aplt's. Supl. App. vol. II, at 301. Therefore, we "appl[y] an 'arbitrary and capricious' standard to a plan administrator's actions." *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998). In reviewing a plan administrator's decision under the arbitrary and capricious standard, we "are limited to the 'administrative record' – the materials compiled by the administrator in the course of making his decision." *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002).

There is no question that the district court applied the straightforward arbitrary and capricious standard of review to the Plan Administrator's denial of benefits. *See* Aplt's Supl. App. vol. II, at 282 ("The court may only reverse [UNUM]'s decision if the decision was not grounded on 'any reasonable basis.'") (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (holding no conflict of interest and applying the arbitrary and capricious standard of review)). However, the district court did not take into consideration UNUM's

-11-

apparent conflict of interest, as insurer of the Plan and Plan Administrator. When there exists such a conflict of interest, we undertake a "sliding scale" analysis, where the degree of deference accorded the Plan Administrator is inversely related to the "seriousness of the conflict." *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996); *see Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999).

In *Fought v. UNUM Life Insurance Co. of America*, No. 02-2176, slip. op. at 15, (10th Cir. Aug. 13, 2004) (per curiam), we further addressed the question of "*how much* less deference ought a reviewing court afford" under the sliding scale analysis. In *Fought,* as here, UNUM has admitted an inherent conflict of interest, serving both as plan administrator and as third party insurer. *Id.* slip. op. at 23. In *Fought* we stated that "[w]hen the plan administrator operates under . . . an inherent conflict of interest, . . . . the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." *Id.* at 19.

> In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

*Id.* at 19-20.   We apply this standard to our consideration of UNUM's denial of benefits.

### 2. The Plan's Language

The policy at issue here, as noted above, includes the following language relevant to this appeal:

You have a pre-existing condition if:

> - you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 6 months just prior to your effective date of coverage; or you had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 6 months just prior to your effective date of coverage; and

> - the disability begins in the first 24 months after your effective date of coverage unless you have been **treatment free** for 12 consecutive months after your effective date of coverage.

Aplt's Supl. App. vol. II, at 48.   The plan also requires that, in some instances, additional materials may be requested by UNUM, and must be supplied by the insured.

> In some cases, you will be required to give UNUM authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability.  UNUM will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

*Id.* at 32.

### 3. Pre-existing Condition Review

Ms. Allison contends that UNUM unreasonably sought her medical records dating back to 1996 – long before the July 1, 1997, start date of Ms. Allison's six-month pre-existing condition exclusion period. She argues that UNUM, upon discovering it applied the incorrect time frame for calculating her coverage, should have asked for records only since July 1, 1997, consistent with its previous request. Ms. Allison contends that UNUM was dissatisfied with its initial analysis, having concluded that she did not seek treatment for MEN-I from August 1, 1997 through February 1, 1998. *See id.* at 118 (Pre-Existing Condition Medical Review, dated Nov. 7, 1999) ("No evidence of treatment for related problems during the dates in questions of 8/1/97 to 1/31/98"); *id.* at 95 (in its initial review, UNUM states Ms. Allison was "treated by Dr. Johnson on 1/30/98 for a condition which caused, contributed to or resulted in the condition for which [she is] now claiming disability"). She contends that UNUM's request backtracks from this conclusion and is essentially a fishing expedition without foundation. At oral argument, appellate counsel also emphasized that the blanket medical release authorization Ms. Allison completed in June 1998 was identical to the newly requested release form.

In support of its argument, UNUM, in turn, relies upon various references to treatment from other doctors that appear in the medical records, as well as Ms.

Allison's somewhat confusing responses in her disability applications. UNUM points out that Ms. Allison received treatment for MEN-I related conditions, including the removal of her parathyroid, which predated her coverage period by nearly two years. Furthermore, Dr. Schiller's February 3, 1998 report stated that she had been previously diagnosed with MEN-I.

UNUM stresses that Ms. Allison's failure to include Dr. Robert Gagle, who treated her in June 1998, on her LTD claim form as a treating physician was a deliberate omission. UNUM states that "[t]he preponderance of the medical evidence indicated that Plaintiff was diagnosed with MEN-I years before her claim for disability," Aple's Br. at 23, and implies that this condition may have been captured by the pre-existing condition exclusion.

UNUM repeatedly insists that Ms. Allison has been deceitful by providing "misleading information." *Id.* at 22. For example, UNUM asserts that she "claimed that she had pancreatic tumors which were inoperable" and that her condition was terminal. *Id.* at 22-23. UNUM also casts aspersions upon Ms. Allison, stating that she "apparently changed jobs in 1997, and her health insurance did not become effective until January 1, 1998. As soon as Plaintiff received coverage, she sought treatment for her MEN-I related symptoms." *Id.* at 23.

-15-

We cannot draw the same conclusions as UNUM: Although the malignancy of the tumors had been disproved at the time Ms. Allison completed her short-term disability claim, *see* Aplt's Supp. App. vol. II, at 265 (Disability Claim dated June 25, 1999), a Physician's Statement that post-dated Ms. Allison's claim also indicated she suffered from "pancreatic abnormalities" and "pancreatic tumors." *Id.* at 219 (Physician's Statement dated August 19, 1999). UNUM appears to fault Ms. Allison for confusing inoperable pancreatic abnormalities with inoperable pancreatic tumors. We also note that Ms. Allison's LTD disability claim form no longer referenced the pancreatic lesions.

Based upon the above, without more, we might be unable to conclude that UNUM could have justified a denial of benefits based on the record before it, especially noting its own miscalculations of the pre-existing condition exclusion period. However, because UNUM diligently sought information to round out its pre-existing condition inquiry, we must also analyze this section of the Plan's language.

### 4. Proof of Claim

The policy authorizes UNUM to request additional information from a claimant. UNUM maintains that the additional records were relevant to another aspect of the Plan's definition of a pre-existing condition, whether there were "symptoms for which an ordinarily prudent person would have consulted a health

care provider in the 6 months just prior to [the] effective date." *Id.* at 48. Thus, UNUM argues it had no way to gauge whether or not Ms. Allison acted as a reasonably prudent person, and as such, its request for additional medical releases and records was reasonable.

First, we note we can discern no apparent need for the additional releases, as the form was a standard one used repeatedly by UNUM in its initial review. Notwithstanding this redundancy, as UNUM points out, a plan administrator may request additional medical information, and the Plan here explicitly anticipates such a need. *Id*. at 32.

The cases upon which UNUM and the district court rely, *Sandoval v. Aetna Life & Casualty Insurance Co.*, 967 F.2d 377 (10th Cir. 1992) and *Kimber v. Thiokol Corp.,* 196 F.3d 1092 (10th Cir. 1999), are instructive. In both *Sandoval* and *Kimber*, the plaintiffs had been recipients of disability benefits. In each, the plan administrator conducted a periodic review and requested additional medical information to confirm the existence of a continuing disability. In *Sandoval*, the claimant "had the opportunity to submit additional evidence of physical or other disability to the Review Committee but declined to do so." 967 F.2d at 382. We held that the Plan Administrator had given the claimant a "full and fair review." *Id.* In *Kimber* we rejected the claimant's suggestion that the Plan Administrator

was unauthorized to reopen its disability determination and to request new evidence. 196 F.3d at 1099.

Here, UNUM miscalculated the date of the pre-existing condition period and needed a more complete picture of Ms. Allison's medical history before it could fully evaluate her request to review the denial of her claim. As part of the proof of claim, UNUM was justified in requesting additional medical and non-medical information. UNUM sent several letters and made repeated telephone calls to Ms. Allison's attorney.

Although UNUM's request for information dating back nearly two years before the coverage period might appear far-reaching, Mr. Belote did not protest. He did not write a letter explaining what physicians, if any, his client had seen during that time, or even during the pre-existing exclusion period. He did not indicate that his client had previously provided all the requested information, which would have likely terminated the inquiry. He did not write back and indicate his refusal to comply with the extensive request; rather, he merely indicated during one conversation that a newly executed medical release form was in the mail. He did little but ignore and evade UNUM's repeated attempts to contact him.

Without offering comment on the scope of the request, we hold that UNUM has established that its requests for additional documentation were reasonable,

and that Ms. Allison's repeated failure to respond to the requests resulted in the denial of her claim. Because UNUM was unable to pinpoint whether the disabling condition was a pre-existing condition and because UNUM diligently attempted to obtain such information, we hold that its denial of benefits was based on a "reasoned application" of the terms of the Plan that is supported by substantial evidence. *Fought*, slip. op. at 20.

**B. Preemption of Oklahoma's Bad Faith Claim**

Ms. Allison next challenges the district court's conclusion that her bad faith claim is preempted by ERISA. First, we note that both parties have managed to flout this circuit's rules with their failure to attach the district court's December 4, 2002, order to the briefs submitted in this court. *See* 10TH CIR. R. 28.2(A) (requiring appellant's brief to include, among other things, "copies of all pertinent written findings, conclusions, opinions, or orders of a district judge" even though they are also included in the appendix); *see also* 10TH CIR. R. 28.2(B) (requiring appellee's brief to include "all the rulings required by (A)," in the event that appellant's brief fails to include them). In addition, Ms. Allison's counsel has apparently failed to include the court's order in the appendix, in violation of 10TH CIR. R. 10.3(C). We have obtained and reviewed the order: in a minute order, the district court granted UNUM's motion for partial summary judgment without further discussion.

The question is whether an Oklahoma state law bad faith claim against an employment disability insurance provider is preempted by ERISA. "Because the scope of ERISA preemption is a question of law, the district court's decision is subject to de novo review." *Kidneigh v. UNUM Life Ins. Co. of Am.*, 345 F.3d 1182, 1184 (10th Cir. 2003). We hold that the district court correctly granted summary judgment to UNUM on this issue because Ms. Allison's bad faith claim (1) conflicts with ERISA's remedial scheme and, in the alternative, (2) is directly preempted under the test announced in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 123 S. Ct. 1471 (2003). *See Kidneigh*, 345 F.3d at 1186 (noting that a bad faith claim under Colorado law was "preempted due to conflict with ERISA's remedial scheme" and, "in the alternative" was "expressly preempted").

### 2. Conflict with ERISA's Remedial Scheme

Perhaps because Ms. Allison did not have the benefit of our decision in *Kidneigh* at the time of briefing, she did not address whether her claims conflict with ERISA's remedial scheme. Such conflict is apparent however, from Supreme Court precedent. *See Rush Prudential HMO v. Moran,* 536 U.S. 355, 377 (2002) ("Although we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the reservation of the business of insurance to the States, we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants to obtain

remedies that Congress rejected in ERISA.") (internal citations and quotation

marks omitted); *see id.* at 373-87 (applying ERISA conflict preemption after

rejecting an ERISA direct preemption claim); *Boggs v. Boggs*, 520 U.S. 833, 841

(1997) ("We can begin, and in this case end, the analysis by simply asking if state

law conflicts with the provisions of ERISA or operates to frustrate its objects.").

Ms. Allison's complaint seeks consequential and punitive damages. In

*Conover v. AETNA U.S. Health Care, Inc*, 320 F.3d 1076 (10th Cir. 2003), we

addressed Oklahoma's approach to a breach of good faith claim:

> Oklahoma's law allows plan participants to obtain consequential and,
> in a proper case, punitive, damages for breach of good faith and fair
> dealing by an insurer. *Nowhere does the Employee Retirement Income
> Security Act allow consequential or punitive damages.* Damages are
> limited to the recovery of "benefits due . . . under the terms of the
> plan." *See* 29 U.S.C. § 1132(a)(1)(B). Oklahoma's bad faith law
> therefore allows plan participants to obtain remedies . . . that Congress
> rejected in the Act.

*Id.* at 1080 (emphasis supplied) (some internal citations and quotation marks

omitted). In *Kidneigh*, 345 F.3d at 1185, we held that nearly identical bad faith

claims in Colorado were "preempted by ERISA because they conflict with

ERISA's remedial scheme:"

> Where a state law "stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress," then the
> state law is preempted. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).
> *State law causes of action, then, are preempted under ERISA both when
> they are expressly preempted by the terms of the statute as well as when
> the state law provides remedies beyond those contained in ERISA itself.*
> *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143-44 (1990);

-21-

*Pilot Life*, 481 U.S. at 54 ("The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive.").

*Id.* (emphasis added). The same is true here: As in *Conover*, we hold that Ms. Allison's breach of contract claim, which seeks consequential and punitive damages, conflicts with ERISA's remedial scheme, and is thus preempted.

### 3. Direct Preemption

Although Ms. Allison's state law claim conflicts with ERISA's remedial scheme, the majority's holding in *Kidneigh* indicates that, "in the alternative," we might also address the direct preemption analysis, one fraught with "statutory complexity." *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 740 (1985). *But see Kidneigh*, 345 F.3d at 1191 (Henry, J., concurring in part and dissenting in part) (noting that where plaintiff's state law claims are barred by ERISA conflict preemption, "it is wholly unnecessary for a court to engage in analysis of whether the other ERISA preemption doctrine applies").

> ERISA's preemption clause broadly states that "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). What Congress took away with one hand, however, it gave back with the other as contained in ERISA's saving clause: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." *Id.*

§ 1144(b)(2)(A). Subparagraph (B) (the deemer clause), in turn, provides:

> Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

*Id.* § 1144(b)(2)(B).

*Kidneigh*, 345 F.3d at 1184.

Ms. Allison contends that the savings clause of ERISA places her claim outside of ERISA's exclusive remedial scheme, and thus the claims are not preempted. In order to determine whether her claim is preempted by ERISA, we must examine whether the Oklahoma state law at issue satisfies two requirements: "First the state law must be specifically directed toward entities engaged in insurance" and "[s]econd . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured. *Id.* (quoting *Miller*, 123 S. Ct. at 1479). Ms. Allison maintains that the Oklahoma bad faith claim satisfies both prongs of *Miller*, and as such, falls within ERISA's savings clause and is not expressly preempted.

In *Kidneigh*, we applied the *Miller* test to determine whether Colorado's bad faith claim regulated insurance, and thus fell within ERISA's savings clause.

-23-

*See id.*; 29 U.S.C. § 1144(b)(2)(A). We held that Colorado's bad faith claim (1) was targeted directly toward insurance, but (2) did not substantially affect the risk pooling arrangement. *Id.* at 1186-87. Thus, the Colorado bad faith claim did not fall within ERISA's savings clause and was directly preempted by ERISA. *See id.*

In *Conover,* a case decided before the Supreme Court's decision in *Miller*, we determined that Oklahoma's bad faith law did not regulate insurance within the meaning of ERISA's savings clause preemption provision. Thus, we must now determine if the recent decision in *Miller* has somehow affected our analysis in *Conover*. 123 S. Ct. at 1479 ("Today we make a clean break from the McCarran-Ferguson factors."). Thus we must determine whether the state law (1) is "specifically directed toward entities engaged in insurance" and (2) "substantially affect[s] the risk pooling arrangement between the insurer and the insured." *Id.*

### a. Specifically Directed Toward Insurance

Here, as in *Kidneigh,* there is no dispute that the Oklahoma law is directed toward the insurance industry. *See Kidneigh* 345 F.3d at 1186; *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 466 (10th Cir. 1997) ("[A]lthough Oklahoma's bad faith law is specifically directed at the insurance industry, we note that, like the bad faith law in *Pilot Life*, its origins are from general principles of tort and contract law."). The first prong of *Miller* is thus satisfied.

-24-

b. Substantially Affects the Risk Pooling Arrangement

In *Gaylor,* we stated that "Oklahoma's bad faith law does not regulate the spreading of policyholder risk." 112 F.3d at 466. Our analysis continued:

> A law which defines the manner in which insurance claims should be processed "declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain [consequential and] punitive damages." *Pilot Life*, 481 U.S. at 51. *Such a law thus does not effect a change in the risk borne by insurers and the insured,* because it does not affect the substantive terms of the insurance contract. On the other hand, a law mandating that a certain disease be covered under health insurance contracts would effect a spread of risk, both from insureds to insurers, and among the insureds themselves.

*Id.* (emphasis added).[1] We hold that the reasoning of *Gaynor* and *Conover* are still binding upon us and that Oklahoma's bad faith claims do not fall within ERISA's savings clause. *But see Kidneigh*, 345 F.3d at 1191 (Henry, J., concurring in part and dissenting in part). We affirm the district court's grant of summary judgment on this issue.

## III.  CONCLUSION

For the reasons stated above we AFFIRM the district court's dismissal of Ms. Allison's claims.

---

[1] We also note that, in *Hollaway v. UNUM Life Ins. Co. of Am.*, No. 98,120, 2003 WL 22439659, at *2, *7 (Okla. Oct. 31, 2003), the Oklahoma Supreme Court answered a certified question regarding whether "Oklahoma's cause of action for breach of the implied covenant of good faith and fair dealing is a 'law which regulates insurance' within the mean[ing] of 29 U.S.C. § 1144(b)(2)(A) and as that term is defined by [*Miller*,]" in the negative. We agree with the dissent that this "decision is not binding on a federal court," although it may be persuasive. *See id.* at *9 (Winchester, J., dissenting); *see also Tafflin v. Levitt*, 493 U.S. 455, 465 (1990) (federal courts, pursuant to § 3231, are "not bound by state court interpretations of the federal offenses constituting RICO's predicate acts"). In addition, we agree that "[p]reemption of state law by federal law, the subject dealt with in today's response that appears packaged and disguised as an answer to a state-law query, presents a pure federal-law question." *Id.* at *8 (Opala, V.C.J. dissenting). The *Hollaway* majority determined that "[b]ecause Oklahoma's law of bad faith does not substantially affect the risk pooling arrangement between the insurer and the insured, it cannot meet the two-prong test of *Miller*. Therefore, we determine that it does not 'regulate insurance' under 29 U.S.C. § 1144(b)(2)." *Id.* at *7.