## Larry D. SELMON *v.*
## METROPOLITAN LIFE INSURANCE CO.

06-1340                                          277 S.W.3d 196

Supreme Court of Arkansas
Opinion delivered February 21, 2008

*Harrill & Sutter, P.L.L.C.,* by: *Luther O'neal Sutter,* for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,* by: *Byron Freeland* and *Jeffrey L. Spillyards,* for appellee.

ANNABELLE CLINTON IMBER, Justice. The instant appeal involves issues arising out of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. § 1001 through 1461 (1999 & Supp. 2007). The appeal was originally filed in the Arkansas Court of Appeals. However, because Arkansas state courts rarely hear cases involving ERISA and because this case involves an area of the law in need of clarification, we assumed the instant case from the court of appeals pursuant to Arkansas Supreme Court Rule 1-2(b)(5) (2007).

Appellant Larry D. Selmon was employed by Great Lakes Chemical Company for over twenty years, performing maintenance and other manual labor. Great Lakes maintained a self-funded, long-term disability plan for its employees that was administered by Appellee Metropolitan Life Insurance Company (MetLife). The plan provided that an employee could receive long-term disability benefits after disclosing all other income sources and completing a Qualifying Disability period. In what was called the Rehabilitation Program, disability benefits could continue for up to twenty-four months after completion of the Qualifying Period if the employee was qualified to receive benefits for Total Disability. An employee was considered to have a Total Disability in two circumstances:

> 1. During the Qualifying Period plus the next 24 months of disability, you must be unable to perform all the normal duties of your regular position with Great Lakes Chemical Corporation or its covered subsidiary and you must at no time engage in any occupation or employment for pay or profit. . . .

> 2. After the Qualifying Disability period plus the next 24 months, you must be completely unable to engage in any occupation or employment for which you are or become qualified because of your education, training, or experience.

Injuries or sickness that were "not treated by a physician" were excluded from the plan, and the plan also specified that benefits would only continue during total disability and would not be continued upon recovery.

In 1997, Selmon suffered a heart attack, but he attempted to return to work. Then, in February 1998, he suffered a second heart attack and underwent angioplasty and a cardiac catheterization. His last day of work at Great Lakes was on February 18, 1998, and he began receiving disability benefits from MetLife in April 1998. Selmon continued to draw disability benefits for almost three years. In April 2001, MetLife discovered that Selmon had not seen a doctor since March 2000. Then, in June 2001, MetLife notified Selmon that his disability benefits had been terminated due to his failure to comply with the plan requirements and remain under the regular care of a physician.

Selmon hired an attorney in September 2002 and obtained permission to supplement his case file with new medical records. MetLife began its review of Selmon's case on May 19, 2003, and on September 19, 2003, MetLife sent Selmon a letter stating that it had decided to uphold its earlier decision. MetLife's decision on review was based upon MetLife's original conclusion that Selmon had failed to comply with the plan's policies, and upon information regarding Selmon's medical condition at the time when his benefits were terminated.

On October 8, 2003, Selmon filed a complaint against MetLife in the Pulaski County Circuit Court. He asserted a claim for wrongful termination of his benefits, as well as common-law bad-faith claims and a deceptive-trade-practices claim. In its answer to Selmon's complaint, MetLife contended that his state-law claims were preempted by ERISA. Selmon then filed a motion for a jury trial, alleging that his claims were saved from federal preemption. After a hearing, the circuit court entered an order denying Selmon's motion for jury trial and finding that his state-law claims were preempted by ERISA. Upon reviewing the merits of Selmon's claim for benefits, the circuit court affirmed MetLife's decision to terminate Selmon's benefits.

Selmon appealed the circuit court's decision. He raises three points of error: (1) the circuit court erred in ruling that his bad-faith claim was preempted by ERISA and in denying his motion for a jury trial, (2) the circuit court erred in applying an abuse-of-discretion standard of review to MetLife's decision, and (3) MetLife wrongfully terminated his benefits.

## *I. Preemption*

Selmon first argues that the circuit court erred in denying his motion for a jury trial based upon ERISA preemption. Selmon asserts that the United States Supreme Court's recent holding in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003) (*KAHP*), overrules the Court's past precedent regarding ERISA preemption and establishes that Selmon's bad-faith claim falls under the ERISA savings clause. MetLife disputes that assertion, arguing instead that the Supreme Court's decision in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 (1987), which addressed federal preemption of state bad-faith claims, was not overruled by *KAHP*, and, therefore remains the controlling precedent here.

The issue of preemption is a question of law, and this court reviews questions of law *de novo* on appeal. *Nucor Corp. v. Kilman*, 358 Ark. 107, 186 S.W.3d 720 (2004). The ERISA preemption clause at 29 U.S.C.A. § 1144(a) states that the provisions of ERISA shall supersede "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b)." 29 U.S.C.A. § 1144(a) (1999). The savings clause in section 1144(b)(2)(A) states that nothing in the subchapter "shall be construed to exempt or relieve any person from any law of any state *which regulates insurance*, banking, or securities." 29 U.S.C.A. § 1144(b)(2)(A) (1999) (emphasis added). A "State law" is defined as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1) (1999).

In *Pilot Life Insurance Co. v. Dedeaux, supra*, the Supreme Court addressed the issue of whether a Mississippi common-law bad-faith claim was preempted by ERISA. *Id.* Mississippi law defined bad faith by an insurance company as when "an insurance carrier refuses to pay a claim when there is no reasonably arguable basis to deny it." *Id.* at 50. The Court used the three factors from the McCarran-Ferguson Act, 15 U.S.C.A. § 1011 through 1015 (1997 & Supp. 2007), to determine whether a practice falls within the "business of insurance." Those factors are:

> [F]irst whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

*Id.* at 48-49 (emphasis in original). Along with finding that the other factors were fulfilled, the Court specifically commented that the law of bad faith does not have the effect of spreading a policyholder's risk. *Id.* at 50. The Court stated that although the law of bad faith may be said to concern the policy relationship between the insurer and the insured, "[t]he connection to the insurer-insured relationship is attenuated at best." *Id.* at 50-51. In explaining its conclusion, the Court stated:

> In contrast to the mandated-benefits law . . . the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages.

*Id.* at 51.

In 2003, the United State Supreme Court decided *KAHP*, *supra*. In that case, the Court decided to make a "clean break" from the McCarran-Ferguson-Act factors because the factors were based on legislation with wording that was very different from that in 29 U.S.C.A. § 1144, and, thus, the factors had provided poor guidance to lower courts and added little relevance to the preemption analysis. *Id.* Accordingly, the Court announced two requirements that must be satisfied for a state law to be deemed a law "which regulates insurance" under section 1144(b)(2):

> *First,* the state law must be specifically directed toward entities engaged in insurance. *Second,* . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured.

*Id.* at 342-43 (emphasis added). The Kentucky law that the Court was asked to analyze in *KAHP* prohibited a health insurer from discriminating against any provider who was located within the geographic coverage area of the health benefit plan and who was willing to meet the terms and conditions for participation in the plan, as established by the insurer. *Id.* at 331-32. When the Court analyzed the Kentucky law under the "risk-pooling" prong, it applied reasoning similar to that in *Pilot Life, supra*, stating that, by expanding the number of providers from whom an insured may receive health services, any willing provider laws alter the scope of permissible bargains between

insurers and insureds in a manner similar to mandated-benefit laws because Kentucky insureds can no longer seek insurance from a closed network of health-care providers in exchange for a lower premium. *Id.* at 338-39.

Because the *KAHP* court essentially retained the "risk pooling" factor of its preemption analysis and because it employed an analysis similar to that in *Pilot Life*, we conclude that the Court did not completely overrule *Pilot Life. Id.* at 338-39, 342. Moreover, the Court specifically cited *Pilot Life*, in reference to the new factors. *Id.* at 342. Further, our decision on this issue is in line with a recent decision by the Tenth Circuit Court of Appeals in *Allison v. Unum Life Insurance Co. of America*, 381 F.3d 1015 (10th Cir. 2004). Accordingly, we find the analysis in *Pilot Life* to be instructive in the instant case.

Arkansas recognizes a claim for bad faith when "an insurance company affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured." *Columbia Nat'l Ins. Co. v. Freeman*, 347 Ark. 423, 429, 64 S.W.3d 720, 723 (2002). Mere negligence or bad judgment is insufficient so long as the insurer is acting in good faith. *Id.* The tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct. *Id.*

We hold that under a *KAHP* analysis, Selmon's common law bad-faith claim is preempted by ERISA. While there is no dispute that our bad-faith law is directed toward the actions of insurance companies, a bad-faith claim does not satisfy the second *KAHP* factor. In *KAHP*, the Court stressed that the law in question affected the risk-pooling relationship between the insured and the insurer because it placed a requirement on the insured/insurer contract that affected the type of risk-pooling arrangements the parties could bargain for. *See KAHP, supra*, at 339. Additionally, the *Pilot Life* Court emphasized that bad-faith law does not define the terms of the insurance contract; instead, it concerns whether and how the insurance company abides by the terms of the contract. *See Pilot Life Ins. Co. v. Dedeaux, supra*. The same is true in Arkansas.

■ Our bad-faith law does not affect the terms of the parties' risk-pooling agreement by mandating benefits or by even reducing the range of risk-pooling agreements that the insurer can offer to insureds. In short, bad-faith law simply requires that an insurer abide by the provisions of the insurance contract in good

faith and allows for remedies, including punitive damages, if the insurer does not abide by the contract appropriately. Thus, we conclude that Selmon's state-law bad-faith claim was preempted by ERISA. Additionally, because a right to a jury trial is not generally recognized in ERISA cases, we affirm the circuit court's decision to deny Selmon's motion for a jury trial. *See Langlie v. Onan Corp.*, 192 F.3d 1137 (8th Cir. 1999).

## II.  Standard of Review

Selmon's second argument is that the circuit court erred in applying an abuse-of- discretion standard of review to his ERISA claims. He asserts that the circuit court should have applied a de novo standard of review because nothing in the record indicates that MetLife was the benefits plan administrator and MetLife's actions were arbitrary and biased. MetLife argues, however, that the circuit court correctly applied an abuse-of-discretion standard because the plan granted MetLife discretion and authority to determine eligibility for benefits and to construe the terms of the plan.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the United States Supreme Court held that a denial of ERISA benefits would be reviewed under a de novo standard unless the benefits plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan. *Id.* at 115. The Eighth Circuit Court of Appeals has interpreted the *Firestone* rule as requiring that either the policy or other plan documents must contain "explicit discretion-granting language" in order to trigger the ERISA deferential standard of review. *McKeehan v. Cigna Life Ins. Co.*, 334 F.3d 789, 793 (8th Cir. 2003).

In the instant case, the benefits plan states that the plan sponsor will appoint a contract administrator "to process and pay claims for these benefits in accordance with the terms of the Plan and to perform certain other services on behalf of the plan." In the plan, "Total Disability" is defined by a list of requirements a claimant must meet to be considered "totally disabled," and the plan gives the contract administrator the authority to determine whether those requirements have been met, stating "[t]he Contract Administrator will decide if this is the case based on medical records, physicians statements and all other information gathered pertaining to the case." The plan also gives the contract adminis-

trator the authority to pay benefits when a claimant has provided "adequate proof of loss." Accordingly, we conclude that the benefits plan at issue here contains "explicit discretion-granting language" to trigger the deferential standard of review, and we affirm the circuit court's decision to apply the abuse-of-discretion standard in this case.

Selmon argues that there is no evidence in the record that MetLife was the contract administrator. Specifically, he points out that the plan lists the contract administrator as Travelers Insurance Company, not MetLife. We find this argument meritless. Not only did Selmon choose to sue MetLife as the contract administrator, but it is clear from the record that MetLife was the successor to Travelers Insurance as the contract administrator.

### III. MetLife's decision to terminate benefits

Selmon contends that in denying his claim for benefits, MetLife gave undue weight to the findings of the physician it hired to perform an independent medical evaluation and disregarded the opinions of his treating physicians. Selmon also argues that MetLife abused its discretion by not obtaining a vocational skills evaluation to determine whether Selmon would be able to perform other jobs. Finally, he asserts that MetLife failed to comply with some of the federal regulations for handling a denial of ERISA claims and failed to follow its own policies and procedures.

### A. MetLife's review

First, we must address the issue of what evidence MetLife was required to review, and, thus, what evidence we should review in making our decision. Selmon's disability benefits were terminated by MetLife in June 2001. During the review process, however, Selmon submitted information regarding his medical condition for the two years after his benefits were terminated. In reaching its decision on review, MetLife did not consider Selmon's medical condition after June 2001. In its letter explaining that decision, MetLife simply stated it did not consider any medical information regarding Selmon's condition after June 2001 because the review concerned only the termination of his benefits in 2001 and his condition at that time. Selmon contends his condition has only worsened since his benefits were terminated, and MetLife erred in not considering the new medical information, namely the emergency room records indicating he had suffered a sixth heart attack in July 2003.

■ We agree with MetLife's decision to limit its review. Because Selmon was no longer a participant in the Great Lakes plan after June 2001, MetLife was not required to consider his medical condition after that date. Accordingly, we cannot conclude that MetLife abused its discretion in limiting its review to the evidence leading up to and including June 2001.

The following evidence was before MetLife for consideration on review:

- In 1997 Selmon suffered a heart attack, and he returned to work.

- In February 1998, Selmon suffered a second heart attack while at work, and Dr. Bruce E. Murphy performed an angioplasty and a cardiac catheterization of his right and left coronary arteries.

- In March 1998, Dr. Murphy noted no improvement in Selmon's condition and restricted his activities to limited stress situations and limited interpersonal relations.

- Later that month, Selmon suffered a third heart attack, and Dr. D. Andrew Henry performed an emergency angioplasty and catheterization of Selmon's right coronary artery.

- Selmon began receiving temporary total disability benefits under the Great Lakes plan in April 1998.

- On June 17, 1998, Dr. Larry Ezell advised MetLife that Selmon was unable to work at that time due to his coronary artery disease. Specifically, Dr. Ezell indicated that Selmon, who was required to lift up to 75 pounds in his job, could not lift the requisite weight. MetLife contacted Selmon that month and he indicated that he still had some chest pain during exertion, but that he had cut his smoking from four packs of cigarettes a day to one pack a day.

- On August 11, 1998, Dr. David Mego conducted a treadmill stress test and noted that Selmon had a good exercise tolerance with an excellent prognosis and index symptoms at a high cardiac workload. That same day, Dr. Murphy reported that Selmon had occasional chest pain with heavy exertion and otherwise had no complaints, and he noted that Selmon still smoked at least one pack of cigarettes a day.

- On August 20, 1998, Dr. Murphy opined that Selmon could return to work and perform all of his regular duties at Great Lakes, but Selmon could not be exposed to the chemicals and fumes at the Great Lakes plant.

- On November 24, 1998, Dr. Ezell examined Selmon and reported that Selmon said he had continued chest discomfort with moderate exertion such as doing yardwork or light housework, or experiencing stress.

- In January 1999, Selmon's attending physician indicated to MetLife that Selmon could return to work, but the physician stated that Selmon would only be able to sit, stand, or walk for one hour at a time and could only lift up to ten pounds continuously.

- In August 1999, MetLife contacted Selmon's attending physician who again indicated that Selmon's condition was stable and he could return to work but not in an environment with fumes and chemicals. A stress test conducted by Dr. Will L. Posey showed improvement in Selmon's heart rate while exercising, normal left ventricular systolic function, and the test was negative for stress-induced myocardial ischemia.

- On February 10, 2000, Dr. Posey conducted another stress test on Selmon. He reported that Selmon was able to exercise for ten minutes without incident, and Selmon denied any chest discomfort even with peak exercise. Dr. Posey concluded that the test was negative for stress-induced myocardial ischemia.

- On February 14, 2000, Selmon reported to Dr. Ezell that he still had chest pain whenever doing upper body torso work and could walk only short distances without stopping to rest.

- In March 2000, a MetLife representative discussed available vocational rehabilitative services with Selmon, but he stated that he had been experiencing mood swings and did not feel mentally able to work, or to participate in any rehabilitative services.

- MetLife did not receive any other medical records regarding Selmon for over a year. Upon contacting Dr. Ezell's office in April 2001, MetLife learned that Selmon had not been to see Dr. Ezell since March 2000, even though Dr. Ezell had instructed

Selmon to return for a check-up every three months. The nurse who discussed Selmon's case specifically stated that Selmon had been noncompliant with the doctor's orders.

- On June 13, 2001, Selmon finally returned to see Dr. Ezell. Dr. Ezell reported that Selmon complained of severe chest pain and shortness of breath and indicated that he was incapable of even mowing his yard or doing the most menial tasks. Dr. Ezell discussed coronary bypass grafting with Selmon, but Selmon indicated that he would rather wait until he had another heart attack before considering the procedure. Dr. Ezell warned Selmon that if he waited for another heart attack he could experience sudden cardiac death or permanent irreversible cardiac damage, but Selmon still refused the surgery.

- On June 15, 2001, MetLife sent a letter to Selmon stating that his long-term disability benefits had been terminated, effective June 1, 2001. The letter listed the reason for terminating the benefits as Selmon's failure to remain in a physician's regular care and failure to provide updated medical records to support his position that he was still disabled.

- Also on June 15, 2001, Selmon was examined by Dr. Aldo Fonticiella who found that Selmon had a "reduced left ventricular systolic function with an ejection fraction of 43% and normal left ventricular internal diameter." Five days later, on June 20, 2001, Dr. Fonticiella reported that Selmon had a "mildly reduced LV systolic function with an ejection fraction of 50%," and a 15% lesion in the right coronary artery.

- In August 2001, when MetLife contacted Dr. Ezell, concerning Selmon's June 2001 condition, he indicated that he did not consider Selmon to be disabled, and he would release Selmon for work, but not at Great Lakes.

- In July 2003, MetLife hired an independent cardiologist, Dr. Chandrakant Pujara to perform an independent medical evaluation of Selmon's condition in June 2001. Dr. Pujara reviewed Selmon's medical records along with notes from Selmon's attending physicians and concluded that, in 2001, Selmon should have been able to perform physical work without much limitation.

After reviewing the above stated evidence, MetLife sent a letter to Selmon on September 19, 2003, upholding its decision to terminate his benefits in 2001. MetLife upheld its decision based

again upon Selmon's failure to regularly see a doctor and provide MetLife with documentation of his condition. MetLife also based its decision on the June 2001 findings of Dr. Fonticiella that Selmon had a 50% ejection fraction, no obstructive disease of the coronary arteries, and only a 15% lesion in the right coronary artery. In sum, MetLife determined that the information provided by Dr. Fonticiella did not indicate that Selmon was unable to return to work as of June 1, 2001.

Given the evidence detailed above, we cannot say that MetLife abused its discretion in determining that Selmon was not totally disabled as of June 2001, and in thereby terminating his benefits. Under the terms of the Great Lakes plan, a claimant will be considered totally disabled during the first twenty-four months after the injury and the qualifying period, upon proof that he cannot perform the duties of his job at Great Lakes. To be considered totally disabled after the first twenty-four months, a claimant must prove that he is unable to engage in "*any* occupation or employment" that the claimant is or becomes qualified to perform due to education, training, or experience. In a civil action for denial of benefits, it is the claimant's burden plan to demonstrate that he is disabled under the terms of the ERISA plan and that he qualifies for benefits. *See* 29 U.S.C. § 1132(a)(1)(B) (1999); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653 (8th Cir. 1992).

Here, as early as August 1998, Selmon's doctors indicated that he would be able to return to work, even manual labor, but could not work around the fumes and chemicals at Great Lakes. In 1999, Selmon's attending physicians indicated that he did have some physical limitations, such as the amount of weight he could lift and the amount of time he could spend sitting, standing, or walking, but ultimately the physicians concluded that his condition was stable and he would be able to return to work. In late 1999 and early 2000, Selmon's treadmill stress tests produced negative results for stress-induced myocardial ischemia. He could complete the tests without incident, exercising for up to ten minutes without chest pain. His doctors also repeatedly noted that Selmon was continuing to smoke up to one pack of cigarettes a day, despite his past heart attacks.

After March 2000, we do not have any indication of Selmon's medical condition until June 2001. During Selmon's June 2001 visit, Dr. Ezell discussed bypass surgery with Selmon, indicating that the surgery would improve his condition, but Selmon refused the surgery. When asked about Selmon's condition at that

time, Dr. Ezell indicated that he did not consider Selmon disabled and would release him to work, but not to his former job at Great Lakes. In June 2001, Dr. Fonticiella found no obstructive disease in Selmon's coronary arteries, noted a 43% ejection fraction on June 15, 2001, and reported a 50% ejection fraction on June 20, 2001. Selmon claims that MetLife should have recognized that an ejection fraction under 50% is abnormal. Such an assertion, however, ignores the fact that MetLife was presented with evidence of a 50% ejection fraction on June 20, 2001. Finally, upon reviewing the medical notes of Selmon's attending physicians, Dr. Pujara, the independent reviewing physician, reached the conclusion that Selmon could return to work, including performing physical labor.

The evidence in the administrative record does not establish that Selmon was unable to perform any work that he was qualified to do. Yet, Selmon asserts that his doctors continually concluded that he was totally disabled. In fact, the record shows that his doctors only concluded that he could not perform his job at Great Lakes, but not that he was completely unable to perform any job. Thus, based upon the above evidence, we cannot say that MetLife abused its discretion in finding that Selmon was not totally disabled under the Great Lakes plan and, therefore, was not entitled to benefits.

Selmon nonetheless asserts that MetLife abused its discretion because it relied completely on the opinion of its own doctor, Dr. Pujara, to reach its decision. He claims that MetLife should have given deference to his attending physicians and concluded that based upon their notes and opinions, he was totally disabled. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), the United States Supreme Court held that ERISA plan administrators are not obliged to accord special deference to the opinions of a claimant's treating physicians. *Id.* at 825. The Court stated, however, that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

Selmon cites *Burch v. Hartford Life & Accident Insurance Co.*, 383 F. Supp. 1119 (W.D. Ark. 2005), as support for his assertion that MetLife arbitrarily refused to credit the evidence from his attending physicians. His reliance on *Burch* is misplaced. The decision in that case is distinguishable on its facts. In *Burch*, the claimant was diagnosed with fibromyalgia and osteoarthritis in the knees and ankles, and she underwent several surgeries to her feet.

*Id.* at 1122-23. She was unable to stand without pain or sit for an extended period with her feet in a dependent position without severe swelling in her feet. *Id.* at 1123. Thus, the claimant's two attending physicians concluded that due to the progressive decline in her condition, the claimant was unable to perform even sedentary work. *Id.* at 1123. An independent reviewing physician concluded that the attending physicians had not given sufficient reasons for why the claimant could not perform sedentary work and determined that she could perform sedentary work with flexibility of position changes. *Id.* at 1124. In reaching its decision to terminate benefits, the plan administrator relied upon the independent physician's conclusions, which were in direct contrast to the information provided by the attending physicians. *Id.* at 1125-26. Accordingly, the district court held that the plan administrator had abused its discretion in terminating the claimant's benefits. *Id.*

Here, unlike in *Burch*, the opinions of Selmon's attending physicians do not in fact conflict with that of Dr. Pujara, the independent reviewing physician. Dr. Pujara reviewed the attending physician's notes and concluded that in 2001, Selmon could have returned to work, even physical labor. As late as 2000, Selmon's own doctors indicated that his condition was stable and he might be able to return to work. Further, Dr. Ezell commented to MetLife in 2001 that Selmon was not disabled, and he would release Selmon to work, although not at Great Lakes. Thus, here, the independent physician's conclusion is in line with that of Selmon's attending physician — that Selmon was not completely unable to do any work.

## B. Vocational Evidence

Selmon also suggests that MetLife should have sought the opinion of a vocational expert to determine whether he was capable of performing "any occupation". Selmon asserts that MetLife's failure to recognize the Social Security Administration's (SSA) decision that he could not perform any other job was an abuse of discretion. This assertion, however, is contrary to a recent decision by the Eighth Circuit Court of Appeals, holding that the SSA's determination as to disability benefits has no bearing on the decision of an ERISA plan administrator. *See Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793 (8th Cir. 2002). Accordingly, we cannot say that MetLife abused its discretion simply because it did not consult the decision of the SSA.

■ The federal appellate courts have held that the question of whether vocational analysis evidence is required should be determined on a case-by-case basis. *See Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276 (10th Cir. 2002). *See also Potter v. Conneticut Gen. Life Ins. Co.*, 901 F.2d 685 (8th Cir. 1990); *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496 (8th Cir. 1989). Here, the record lacks substantial evidence that Selmon would not be able to perform any job. According to his attending physicians' notes, Selmon was limited in the amount of weight he could lift, and in the amount of time he could spend either sitting, standing, or walking. Furthermore, the record reveals that MetLife contacted Selmon about participating in vocational rehabilitation programs, but despite MetLife's efforts, he refused rehabilitation services. Thus, the record indicates that Selmon was only partially limited in his physical abilities and that he was noncompliant when MetLife attempted to assist him in learning new job skills. Once again, it is clear that MetLife did not abuse its discretion in failing to seek an expert vocational analysis.

### C. MetLife's internal policies and procedures

Selmon next alleges that MetLife abused its discretion by failing to comply with some of its own internal policies and procedures. First, he contends that MetLife was required to consult his attending physicians when the results reached by the independent reviewing physician were inconsistent with those of his attending physicians. He also claims that MetLife did not even attempt to contact his treating physicians. These statements are simply not supported by the record. First, the conclusion of Dr. Pujara — that Selmon could return to work — was not completely inconsistent with the views of Selmon's attending physicians. In fact, his attending physicians had noted improvement in Selmon's recent test results and had never concluded that he could not perform "any" occupation. Moreover, MetLife was in contact with Selmon's attending physicians well after his benefits were terminated in June 2001.

■ Secondly, Selmon argues that MetLife acted in contravention of its own Summary Plan Description by not awarding Selmon benefits once the Social Security Administration (SSA) found him disabled. He contends that the Summary Plan Description implies that once the SSA determines that a claimant qualifies

for social security disability benefits, the plan automatically pays benefits. The Summary Plan Description explains that a claimant must qualify for disability benefits and states that if the claimant qualifies "for disability benefits from Social Security or other group plans those other sources pay first and the company plan makes up the difference until you have sixty percent of your pay." A plain reading of the Summary Plan Description does not indicate that a claimant will automatically receive benefits once he qualifies for Social Security benefits. Instead, the plan simply states a claimant's other income sources must pay benefits before the plan will pay. Thus, we find no merit in Selmon's arguments concerning MetLife's compliance with its own policies and procedures.

### D. Federal claims-handling procedures

Finally, Selmon asserts that MetLife did not comply with federal ERISA claims-handling regulations because it failed to provide him adequate notice that his claim was being terminated and failed to provide a timely review. Under 29 C.F.R. § 2560.503-1(g)(1), an ERISA plan administrator must provide a claimant written notice of a benefit determination, which includes, among other things, the specific reason or reasons for the adverse determination, reference to the specific plan provisions on which the determination is based, and a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary. 29 C.F.R. § 2560.503-1(g)(1)(i)-(iii) (2007).

Here, MetLife initially terminated his benefits based upon his failure to comply with the plan provisions, which required him to remain under the regular care of a physician. In April 2001, a MetLife representative phoned Selmon and asked him for medical records from March 2000 until April 2001, and the MetLife representative informed him that in order to remain eligible for benefits under the plan, he must see a physician regularly. Finally, in June 2001, when Selmon still had not supplied MetLife with medical records for the past year, MetLife sent him a letter terminating his benefits, which contained a description of the reason his benefits were terminated, the plan provision he allegedly violated, and what material was missing from his file, namely updated medical records. Accordingly, we conclude that MetLife complied with the notice requirements set forth in 29 C.F.R. § 2560.503-1(g)(1).

Pursuant to 29 C.F.R. § 2560.503-1(h)(4)(i), a plan administrator must notify a claimant of a benefits determination on review within sixty days after the receipt of the claimant's request for review, unless the plan administrator determines that there are special circumstances that require an extension of time for processing the claim, but in no event shall an extension exceed sixty days after the initial sixty day period. 29 C.F.R. § 2560.503-1(h)(4)(i) (2007). In April 2003, Selmon requested an opportunity to supplement the administrative record with updated medical records. MetLife granted Selmon permission to supplement the record but requested that all information be submitted by May 19, 2003, when MetLife would begin its review. Then, on June 17, 2003, MetLife contacted Selmon's attorney, indicating that it needed an extension in the time for review in order to have an independent physician review Selmon's file. After June 17, Selmon continued to send MetLife updated medical information, and on August 29, 2003, MetLife sent Selmon another letter indicating that an extension was needed to review the additional information Selmon had provided. Then, on September 19, 2003, MetLife sent Selmon a letter stating its decision that the termination of his benefits would be upheld.

We conclude that MetLife complied with the timing requirements for a benefits- determination review. Selmon knew that MetLife would begin reviewing his claim on May 19, 2003. The initial sixty-day review period ended July 19, 2003, and MetLife's extension period ended on September 19, 2003, the date it sent Selmon a letter confirming its decision on review.

For all of the above-stated reasons, we affirm.