**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN A. DeGRADO,

        Plaintiff-Appellee,

v.

JEFFERSON PILOT FINANCIAL
INSURANCE COMPANY, a Nebraska
corporation,

        Defendant-Appellant.

No. 05-1281

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 02-CV-1533-PSF-BNB)**

---

Michael S. Beaver, Holland & Hart, P.C., Greenwood Village, Colorado (Marcy G. Glenn, Holland & Hart, P.C., Denver, Colorado; Todd W. Miller and Catherine C. Crane, Holland & Hart, P.C., Greenwood Village, Colorado, with him on the briefs), for Defendant-Appellant.

Thomas L. Roberts, Roberts, Levin & Patterson, P.C., Denver, Colorado (Laura E. Schwartz and Zachary C. Warzel, Roberts, Levin & Patterson, P.C., Denver, Colorado; Marilee E. Langhoff, Marilee E. Langhoff, P.C., Centennial, Colorado, with him on the brief), for Plaintiff-Appellee.

---

Before **BRISCOE, BALDOCK,** and **TYMKOVICH**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Defendant Jefferson Pilot Financial Insurance Company (Jefferson) appeals from the district court's entry of judgment in favor of plaintiff John DeGrado on his claim under § 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), for increased benefits under a long-term disability policy provided by Jefferson to DeGrado's employer. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, reverse the judgment of the district court, and remand to the district court with directions to remand the case to Jefferson for further review of DeGrado's claim.

I.

*Factual background*

DeGrado is a forty-year-old man who, in 1991, began suffering from ulcerative colitis and/or Crohn's disease. In the early phases of his disease, DeGrado experienced periodic flare-ups of symptoms (e.g., diarrhea, abdominal pain, bloody stools, fatigue) that would last from a few weeks to a few months, and then be followed by periods of remission.

In 1997, DeGrado began working for Sloans Lake Management Corporation (Sloans Lake) as Manager of Strategic Marketing, an executive position that encompassed the sale, marketing, and management of insurance products. DeGrado was compensated by base salary and sales commissions.

On April 14, 1999, DeGrado temporarily stopped working due to symptoms he was experiencing from his disease, as well as extreme fatigue, diffuse pain throughout his

body, and chronic insomnia. In July 1999, DeGrado submitted a claim for benefits under a long-term disability policy (the Policy) issued to Sloans Lake by Guarantee Life Insurance Company (Guarantee). Guarantee ultimately paid that claim in early 2000.

DeGrado returned to work on September 20, 1999. At some point in 2000, DeGrado's symptoms began to reappear and gradually worsened. In late November 2000, DeGrado concluded he could not continue to carry out his job duties due to his physical symptoms. Accordingly, DeGrado ceased working and submitted a second disability claim to Jefferson, who by that point had merged with Guarantee and had effectively taken over responsibility for administering and paying claims under the Policy.

After investigating DeGrado's claim, Jefferson, on March 1, 2001, sent a letter to DeGrado rejecting his claim for disability benefits. In the letter, Jefferson concluded that DeGrado's claim was one for a new period of disability beginning on November 28, 2000. However, Jefferson concluded that DeGrado "d[id] not have a severity of impairment to support Total Disability" under the Policy. App. at 496. In support of that conclusion, Jefferson pointed, in part, to notes from DeGrado's visit with Dr. John Sabel on December 4, 2000, during which Dr. Sabel noted that DeGrado's "Crohn's colitis was improved clinically." Id. at 497. Jefferson also emphasized that, although notes from Dr. Stuart Kassan indicated that DeGrado suffered from polyarthritis and seronegative arthritis, "there [we]re no records of joint X-Rays or MRIs in [DeGrado's] file . . . ." Id. Jefferson lastly noted that, during a phone conversation on February 7, 2001, DeGrado

-3-

himself indicated that his "disabling conditions [we]re [his] Crohn's Disease and Fibromyalgia," rather than any arthritic symptoms. Id. In sum, Jefferson concluded that "the objective medical records d[id] not support that [DeGrado] had a severity of impairment [as of November 28, 2000] . . . that would prevent [him] from performing the main duties of [his] occupation . . . ." Id. at 498.

DeGrado, proceeding pro se, protested the denial to the Colorado Division of Insurance. Jefferson treated DeGrado's protest as an appeal and, on April 9, 2001, sent DeGrado a letter reaffirming its decision to deny him disability benefits. In particular, Jefferson concluded that DeGrado's Crohn's disease had improved, there were no medical records indicating that DeGrado's polyarthritis and seronegative arthritis rendered him totally disabled, and there was no "objective medical documentation supporting a diagnosis of Fibromyalgia or that this diagnosis precluded [DeGrado] from performing [his] occupation." Id. at 500. Thus, Jefferson again concluded that "the records . . . failed to support a severity of impairment . . . at the time [DeGrado] stopped working." Id. The letter also stated:

> Under this claim, you stopped working on 11/27/00. * * * Although you indicated previously that you felt this should be considered a continuation of your previous claim, all information we have been able to obtain indicates you returned to work full-time after your last claim for longer than 6 months, therefore resulting in a new, separate claim.

Id. at 499 (emphasis added).

DeGrado obtained counsel and, on July 13, 2001, formally appealed Jefferson's

-4-

decision. Notably, DeGrado did not challenge Jefferson's conclusion that the claim submitted on November 28, 2000, was a "new, separate claim," i.e., independent from DeGrado's first disability claim. Instead, DeGrado challenged only Jefferson's conclusion that he was not totally disabled.

Jefferson initially responded by letter on August 28, 2001, informing DeGrado's counsel that "an Independent Medical Examination . . . [wa]s necessary prior to [Jefferson's] final review," and that DeGrado would be contacted shortly thereafter to "set up [such an] appointment." Id. at 487. However, for reasons unexplained in the record, DeGrado was never contacted to set up such an examination. Instead, in early September 2001, Jefferson sent DeGrado's medical records to Dr. Jay Benson, a gastroenterologist in Hartford, Connecticut, for a "peer review." Id. at 485. In particular, Jefferson asked Benson to review the records and determine "if there [wa]s severity of impairment that would render . . . DeGrado UNABLE TO PERFORM his occupation as a manager of strategic marketing beginning 11-28-2000." Id. at 486.

On October 8, 2001, Dr. Benson sent a one-page letter to Jefferson indicating that he had completed his review of DeGrado's medical records and providing the following opinion regarding DeGrado's condition:

> The GI manifestations of [Degrado's] colitis, except during acute flareups, should not produce significant disability. On the other hand, the patient has major functional limitations secondary to seronegative arthritis and a fibromyalgia syndrome that includes extreme fatigue and weakness. The latter limitations have been detailed by the rheumatologist, Dr. Stuart Kassum.

The patient's type of colitis is not definite. At various times he has been labeled as ulcerative colitis and Crohn's colitis. From the medical records submitted and without review of the biopsies, there are clinical features favoring each diagnosis. Additional diagnostic steps are available to help clarify this issue. The latter is important since medical treatment options, long-term prognosis, and the role of surgery all vary with the two diagnoses. If the patient does have the working diagnosis of Crohn's colitis, there are additional medical treatment options that have not been used.

Id. at 476 (emphasis added).

At some point before Jefferson received Benson's letter, Jefferson adjuster Susan Wharton prepared a report comparing the financial exposure to the company if DeGrado's disability were treated as "new" or "distinct" from his first disability versus if the disability was treated as "recurrent" (i.e., related to the first disability). According to Wharton's calculations, if DeGrado's claim was treated as a "new" period of disability, thereby meaning benefits would be based on his 2000 earnings, the total potential payout, net of Social Security benefits, would be approximately $2,821,000.00.[1] In contrast, Wharton determined that if DeGrado's claim was treated as "recurrent," thereby meaning benefits would be based on his 1998 earnings, the total potential payout, net of Social Security benefits, would be approximately $610,000.00. Although Wharton's report is undated, the information contained on the report suggests it was prepared at some point prior to October 3, 2001. More specifically, one page of the computer-generated report

_____

[1] DeGrado's base salary was approximately the same in the twelve-month period preceding each of his two disability claims. However, his sales commissions were substantially greater in the year preceding his second disability claim than in the year preceding his first disability claim.

lists DeGrado's birthdate as "10/3/1965" and his age as "35," clearly suggesting the report was produced prior to October 3, 2001, when DeGrado would have turned 36 years of age. Id. at 472.

On December 13, 2001, Jefferson's Risk Service manager, Ruth Hagemann, sent a letter to DeGrado's counsel resolving DeGrado's formal appeal.[2] Id. at 467. In her letter, Hagemann concluded, presumably based on Dr. Benson's letter, that DeGrado was "totally disabled." Id. However, contrary to the conclusion reached earlier in the year by the prior claims representative assigned to DeGrado's case, Hagemann concluded that DeGrado had not worked full-time for at least six months since returning to work after his first period of disability:

> Information in the file indicates Mr. DeGrado originally was totally disabled from 04/14/1999 to 09/20/1999. His claim was then closed as we were advised he had returned to work full time (09/21/1999). We subsequently were advised that Mr. DeGrado began missing time from work around January 5, 2000, due to the same diagnosis. We were advised that Mr. DeGrado's employer was paying full time wages, but that he was working less than full time. Since Mr. DeGrado returned to his regular occupation on a full-time basis for less than six months, and because his disability is due to an injury or sickness which is the same as, or related to the cause of his original disability, his disability is considered a recurrent disability and the original claim will be reopened with consideration of benefits from January 5, 2000 to the current date.

Id. Based upon her conclusion that DeGrado's disability was "recurrent," Hagemann indicated that Jefferson would pay benefits to DeGrado in the following manner:

---

[2] It is uncontroverted that Hagemann failed to provide DeGrado with a final resolution to his appeal within the time period required by ERISA and the express terms of the Policy.

Benefits provided by this policy are reimbursed at the rate of 66.67% of his basic monthly earnings, less other sources of income. Based upon the information in our possession, 66.67% of Mr. DeGrado's basic monthly earnings at the date his disability originally began, would be equal to $3,750.19. This will be his monthly benefit through 4/30/2001. Beginning on 05/01/2001, we will be coordinating our benefit with Mr. DeGrado's Social Security Disability benefits that he received, $1528.00 and $764.00 for dependent Social Security.

Therefore, beginning 05/01/2001, Mr. DeGrado became eligible to receive the monthly benefit payment of $1,458.19 per month.

Id. at 468.

*Procedural background*

DeGrado filed suit against Jefferson on August 7, 2002, alleging five claims for relief: (1) wrongful denial and delay of benefits under ERISA; (2) breach of fiduciary duty under ERISA; (3) declaratory judgment; (4) breach of contract; and (5) breach of the covenant of good faith and fair dealing. In September 2002, Jefferson moved to dismiss the latter two claims based on ERISA preemption. DeGrado ultimately confessed the motion, voluntarily dismissed those two claims, and withdrew his demand for a jury trial on those claims.

On February 17, 2004, Jefferson moved for summary judgment on the remaining three claims. DeGrado, in response, withdrew the breach of fiduciary duty and declaratory judgment claims, leaving only the claim for benefits to be ruled upon. The district court subsequently denied Jefferson's motion for summary judgment, but indicated that it would decide DeGrado's claim for benefits on the basis of the administrative record and the parties' final briefs. On September 27, 2004, following

submission of the parties' final briefs, DeGrado sought and was permitted by the district court to take limited additional testimony from Hagemann. On December 3, 2004, Degrado designated additional testimony from Hagemann's deposition. On December 14, 2004, Jefferson cross-designated additional testimony from Hagemann's deposition.

On April 28, 2005, the district court issued a final order granting judgment in favor of DeGrado on his claim for benefits. In doing so, the district court concluded that (1) Jefferson's decision to treat DeGrado's claim as "recurrent," rather than "new" was unreasonable, and (2) even if DeGrado's claim was properly treated as "recurrent" rather than "new," Jefferson's determination of the monthly benefit amount was unreasonable because the terms of the Policy entitled DeGrado to monthly benefits based on his income immediately prior to his second period of disability, rather than on his income immediately prior to filing his first disability claim. On May 17, 2005, the district court entered judgment in favor of DeGrado in the stipulated amount of $328,020.62 (which amounted to a correction of Jefferson's underpayment of past benefits) and ordered Jefferson to pay DeGrado future monthly benefits in accordance with the district court's final order.

II.

Jefferson now appeals the district court's entry of judgment in DeGrado's favor on his claim for increased disability benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). "That section allows a beneficiary of an ERISA plan to bring suit 'to recover benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'"

Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 767 (10th Cir. 2004) (quoting statute).

*Standards of review*

At the outset, we must determine the appropriate standards of review to apply to the district court's decision and to Jefferson's decision regarding DeGrado's entitlement to monthly disability benefits under the policy. Allison v. Unum Life Ins. Co. of America, 381 F.3d 1015, 1021 (10th Cir. 2004). A district court's determination of the proper standard to apply in its review of an ERISA plan administrator's decision is a legal conclusion that we review de novo. Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 807 (6th Cir. 2002); see also Dang v. UNUM Life Ins. Co. of Am., 175 F.3d 1186, 1189 (10th Cir. 1999) ("We review the district court's decisions on questions of law . . . de novo."). Likewise, we review de novo the district court's application of the appropriate standards to a plan administrator's denial or grant of benefits under a plan. See Chambers v. Family Health Plan Corp., 100 F.3d 818, 827 (10th Cir. 1996).

A decision regarding the award of plan benefits "'challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Id. at 825 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Here, it is undisputed that the policy at issue gives Jefferson discretionary authority to determine eligibility for benefits and to construe the terms of the policy. Therefore, we apply "an 'arbitrary and capricious' standard to [the]

-10-

plan administrator's actions.'" Id.

Importantly, however, it is also undisputed that Jefferson, as both the insurer and the plan administrator, operates under an inherent conflict of interest. See Welch v. Unum Life Ins. Co. of Am., 382 F.3d 1078, 1087 (10th Cir. 2004) (reaching similar conclusion under similar circumstances). More specifically, because it is both the insurer and plan administrator, Jefferson "may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries." Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004) (internal quotation marks omitted). "When there exists such a conflict of interest, we undertake a 'sliding scale' analysis, where the degree of deference accorded the Plan Administrator is inversely related to the 'seriousness of the conflict.'" Allison, 381 F.3d at 1021 (quoting Chambers, 100 F.3d at 825). Where, as here, an inherent conflict of interest exists, "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." Fought, 379 F.3d at 1006. We, in turn, are obligated to "take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." Id.

*Calculation of monthly benefits for "recurrent" disability claims*

We begin our analysis by focusing on Jefferson's interpretation of how monthly benefits are to be calculated under the Policy for "recurrent" disability claims. As noted, the district court concluded that even if DeGrado's second claim for disability benefits

-11-

was properly classified by Jefferson as "recurrent," Jefferson misinterpreted the Policy when it calculated DeGrado's monthly benefits in the same manner as DeGrado's first disability claim. On appeal, Jefferson challenges the district court's conclusion and, as noted, bears the burden of proving that its interpretation of the terms of the Policy is reasonable. See Fought, 379 F.3d at 1006.

The Policy discusses the subject of "RECURRENT DISABILITY" in the following manner:

> "Recurrent Disability" means a Disability due to an injury or Sickness which is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable. A Recurrent Disability will be treated as follows:
>
> > 1. A Recurrent Disability will be treated as a new period of Disability, and a new Elimination Period must be completed before further Monthly Benefits are payable; if the Insured Employee returns to his or her regular occupation on a full-time basis for six months or more.
> >
> > 2. A Recurrent Disability will be treated as part of the prior Disability, if an Insured Employee returns to his or her regular occupation on a full-time basis for less than six months.
>
> To qualify for a Monthly Benefit, the Insured Employee must earn less than the percentage of Predisability Income specified in the Partial Disability Monthly Benefit section. Monthly Benefit payments will be subject to all other terms of this Policy for the prior Disability.
>
> If an Insured Employee becomes eligible for coverage under any other group Long Term Disability policy, this Recurrent Disability provision will cease to apply to that Insured Employee.

App. at 794.

Jefferson contends that, because the Policy expressly requires it to treat a recurrent

claim as "'part of the prior Disability,' "the Monthly Benefit for the second claim [must] necessarily [be] the same as the Monthly Benefit for the first claim." Aplt. Br. at 55. Jefferson further contends that "[i]f the 'part of the prior Disability' language leaves any doubt about the benefit calculation for the second claim, that doubt is fully resolved by the Policy's statement that 'Monthly Benefit payments will be subject to all other terms of this Policy for the prior Disability.'" Id. "That the term 'for the prior Disability' is present in this provision," Jefferson argues, "compels a conclusion that benefits for the second disability must be calculated in the same manner as the benefits for the first disability were calculated." Id. at 56.

The district court concluded that Jefferson's interpretation was unreasonable. More specifically, the district court concluded that "[i]f the policy meant to state that the monthly benefit for a recurrent disability found to be part of a prior disability under the second sub-paragraph would be the same as the benefits paid for the prior disability, it certainly could have used more specific and direct language than the . . . sentence" in the policy that read: "Monthly benefits will be subject to all other terms of this Policy for the prior Disability." App. at 3421. The district court instead concluded that this quoted language meant "that the manner of calculating and paying the Monthly Benefit in any recurrent disability case w[ould] be performed in accordance with the other calculation and payment provisions of the policy." Id. at 3421-22.

We disagree with the district court, and instead conclude that Jefferson's interpretation of the Policy is reasonable. In particular, we conclude that Jefferson has

-13-

reasonably interpreted the Policy's references to treating a recurrent disability as "part of the prior Disability" and awarding "Monthly Benefit payments" for the recurrent disability "subject to all other terms of this Policy for the prior Disability," as indicating that the monthly benefit payments for a recurrent disability will be precisely the same as they were for the prior disability.

*Jefferson's treatment of claim as "recurrent" and part of prior disability*

We next turn to Jefferson's determination that DeGrado's disability was "recurrent" under the terms of the Policy. In doing so, we first address Jefferson's contention that the district court erred by considering evidence that was not part of the administrative record. "In reviewing a plan administrator's decision under the arbitrary and capricious standard, we are limited to the administrative record – the materials compiled by the administrator in the course of making [its] decision." Allison, 381 F.3d at 1021 (internal quotation marks omitted); see Sandoval v. Aetna Life and Casualty Insurance Company, 967 F.2d 377, 380 (10th Cir. 1992) ("In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision."); cf. Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002) (holding that district court may, in its discretion and in exceptional circumstances, supplement the administrative record when conducting de novo review of decisions of ERISA plan administrator). "Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator

-14-

would seriously impair the achievement of [ERISA's] goal" of "provid[ing] a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." Id. (quoting Perry v. Simplicity Engineering, 900 F.2d 963, 967 (6th Cir. 1990)).

It is apparent from the district court's Final Order that the district court did, in fact, consider at least two items of evidence that were not part of the administrative record: (1) an affidavit from DeGrado; and (2) deposition testimony from Hagemann. In light of the precedent outlined above, we conclude it was improper for the district court to have done so. Thus, in conducting our own review of Jefferson's decision, we shall limit ourselves to the materials that Jefferson actually compiled in the course of making that decision.

The Policy discusses the subject of "RECURRENT DISABILITY" in the following manner:

> **What happens if you return to work but become Disabled again?**
>
> * * *
>
> After the Elimination Period, when a return to work as an Active Full-time Employee is followed by a recurrent Disability, and such Disability is:
>         (1) due to the same cause; or
>         (2) due to a related cause; and
>         (3) within 6 month(s) of the return to work,
> the period of Disability prior to your return to work and the recurrent Disability will be considered one Period of Disability, provided the Group Insurance Policy remains in force.
>
> If you return to work as an Active Full-time Employee for 6 month(s) or more, any recurrence of a Disability will be treated as a new Disability. A new Disability is subject to a new Elimination Period and a new Maximum Duration of Benefits.

App. at 744 (emphasis added). In turn, the Policy defines an "Active Full-time Employee" as "an employee who works for the Employer on a regular basis in the usual course of the Employer's business. The employee must work the number of hours in the Employer's normal work week. This must be at least the number of hours indicated in the Schedule of Insurance." Id. at 737 The Policy's "Schedule of Insurance" states that "All Active Full-time Employees" are eligible for benefits, and defines "Full-time Employment" as "30 hours weekly." Id. at 736.

Jefferson argues that it reasonably interpreted the term "full time," as used in the Policy, to mean "40 hours or more per week." Aplt. Br. at 35. We disagree. Although there is evidence in the administrative record indicating that DeGrado normally worked more than forty hours per week prior to his first period of disability, it is clear that the Policy was generally meant to extend disability benefits to those Sloans Lake employees who worked thirty hours or more per week. Further, there is no indication in the administrative record that, in denying DeGrado's second claim for disability, Jefferson defined "full time" to mean "40 hours or more per week." To the contrary, the administrative record indicates that Jefferson's own employees interpreted the phrase "full time" as meaning thirty hours or more per week.

Thus, if DeGrado worked at least thirty hours per week for six months or more after returning from his first period of disability, then his second claim for disability would be considered "new" under the terms of the Policy outlined above. In contrast, if DeGrado failed to work at least thirty hours per week for six months or more after

-16-

returning from his first period of disability, then his second claim for disability would be considered "recurrent."

In determining whether Jefferson's decision on this issue was supported by substantial evidence, we conclude it is useful to compartmentalize the evidence in the administrative record into two categories: (1) evidence obtained by Jefferson prior to its initial denial, on March 1, 2001, of DeGrado's claim for disability benefits; and (2) evidence obtained by Jefferson between the initial denial and its subsequent decision on December 13, 2001, to treat DeGrado's claim as "recurrent" and award him monthly benefits equivalent to those he was receiving during his first period of disability.

*1) Evidence obtained prior to initial denial*

Prior to its initial denial of DeGrado's claim, Jefferson obtained medical records and reports from DeGrado's treating physicians. Those records indicated that DeGrado suffered from various physical symptoms, including fatigue, diarrhea, and rectal bleeding, from January through at least August of 2000. None of those medical records, however, indicated whether or not DeGrado's physical symptoms kept him from working.

Jefferson also obtained from Sloans Lake relevant payroll records for DeGrado. Those records unequivocally indicated not only that DeGrado was paid for full-time work during the period in question, but that he actually worked more than thirty hours per week for more than six months. More specifically, the records indicated that, between January 8 and November 24, 2000, DeGrado worked between seventy-two and eighty hours each two-week pay period, with the exception of two pay periods when he worked sixty-six

-17-

and sixty-four hours (the sixty-six hour pay period occurred in July 2000, and the sixty-four hour pay-period occurred in October 2000). App. at 1650. As noted by the district court, these payroll records clearly "support[] a conclusion that [DeGrado] did work full-time for most of the year 2000, and also reflect[] the onset of his illness and inability to work full-time commencing in November 2000." Id. at 3426-27.

Aside from the payroll records, Jefferson collected conflicting items of evidence regarding DeGrado's work status. To begin with, Jefferson had a November 30, 2000 "Employee Statement" completed by DeGrado and filed as part of his second claim for disability benefits, which stated, in pertinent part: "I have been working from home a lot, I also work very few hours." Id. at 2179. In addition to this written statement from DeGrado (which is clearly ambiguous with regard to precisely when he began working "very few hours"), Jefferson's claims file also contains a series of notations from early 2001 regarding whether or not Jefferson worked full-time during the period in question. To begin with, there was a note to the claims file dated February 13, 2001, outlining a telephone conversation that a Jefferson employee had with DeGrado. That note indicates, in pertinent part, that DeGrado stated "he was considered a full-time employee until he stopped working nov. 2000," but that "he really could have gone back out on claim jan. 2000 because it was at that point that he started working only 10-15 hours per week at home." Id. at 323. DeGrado allegedly further stated that "his employer continued paying him his full salary because they knew he was having health problems, and whatever he could work would be fine, that they would continue to pay him." Id. In a second note to

-18-

the file, dated February 19, 2001, a Jefferson employee recounted another telephone conversation with DeGrado during which "he said that it was by the grace of god that they [Sloans Lake] continued to pay him, and even though he was not working 40 hours per week, he was still considered a full-time [employee] and paid as if [he] was working 40 hours per week." Id. at 327. That same note also stated, however, that the Jefferson employee advised DeGrado "that in order to be eligible for benefits, the policy has a min. no. of hrs. that have to be worked ea. week, and that that number is 30," and that DeGrado said in response "that would be no problem." Id. (emphasis added). A third such note, dated February 21, 2001, summarized a conversation a Jefferson employee had with a human resources employee at Sloans Lake regarding obtaining payroll records for DeGrado. Id. at 330. That note stated, in pertinent part:

> I ADVISED HER JOHN [DEGRADO] INDICATED TO ME THAT HE STARTED WORKING PART-TIME IN JANUARY OF 2000, AND THERE IS AN ELIGIBILITY PROVISION OF THE POLICY WHICH INDICATES THAT IF YOU ARE NOT WORKING 30 HOURS EACH WEEK, THEN YOU ARE NOT ELIGIBLE FOR COVERAGE. SHE WAS INCREDULOUS AT THIS, AND QUESTIONED ME ON IT. I ADVISED HER THAT JOHN TOLD ME HE HAS WORKED FROM HOME SINCE JAN. 2000, WORKING 10-15 HOURS PER DAY. * * * I ADVISED HER THAT JOHN TOLD ME THAT HE WAS TOLD BY THE CEO OF THEIR COMPANY THAT NO MATTER HOW MANY HOURS HE WAS ABLE TO WORK, THEY WOULD PAY HIM IN FULL. SHE SAID IF THAT'S TRUE, SHE WAS NOT AWARE OF THAT, AND THAT WOULD BE BETWEEN JOHN'S SUPERVISOR AND THE CEO.

Id. at 331 (emphasis added). A fourth note, dated February 28, 2001, describes a telephone call that a Jefferson employee made to Sloans Lake in an attempt to speak with

DeGrado's immediate supervisor.  Id. at 333-34.  According to that note, the Jefferson employee was informed that Sloans Lake had been sold and that "EVERYONE [including, apparently, DeGrado's immediate supervisor] WAS LET GO" the day prior to the telephone call.  Id. at 334.  Significantly, that note concludes with the following statement: "IT APPEARS AS WE WILL [have to rely on the payroll records] AS THERE IS NO ONE LEFT TO SUPPORT JOHN'S ALLEGATION THAT HE WAS ONLY WORKING 10-15 HOURS PER WEEK."  Id.

All of this evidence was subsequently summarized in Jefferson's initial letter to DeGrado (dated March 1, 2001) denying his second claim for benefits:

> [I]n reviewing your claim, conflicting information surfaced regarding your Date of Disability.  As you know, you filed a previous Long Term Disability claim with our company, which we paid for the time-period of July 13, 1999 (the end of your Elimination Period) to September 20, 1999 (the date you returned to work full-time).  The claim form submitted from your Employer indicates that the last date you worked was November 29, 2000 (but that you did not work a full day on that date).  The claim form you submitted indicates the last date you worked was November 28, 2000, but that you only worked a few hours on that date.  However, pursuant to our telephone conversation of February 19, 2001, you indicated that you stopped working full-time in January 2000, and that you only worked 10 to 15 hours per week from your home.  You indicated that your Employer still considered you a full-time Employee, and that they continued to pay you your full salary.
>
> I discussed this issue with Bernadette Harrington at Sloans Lake, and she indicated that she was not aware of this situation, and that if you did not work 40 hours per week, your payroll records would reflect such information.  However, your payroll records do not reflect that you worked 10-15 hours per week.  Bernadette indicated that it might be something that was worked out with your supervisor.  When I asked to speak with your supervisor, I was informed that due to layoffs within your company, many people were terminated, including your supervisor.

-20-

Id. at 497-98.  Importantly, the letter concluded with the following statement regarding

the position ultimately adopted by Jefferson as to the date of DeGrado's second disability:

> Consequently, as your Employer indicated that you stopped working on
> November 28, 2000, and as your payroll records reflect that you were
> working a fairly regular schedule up until November 2000, we are
> concluding that your date of disability is November 28, 2000.

Id. at 498 (emphasis added).

*2) Evidence obtained after initial denial*

On the date it issued its initial denial letter, i.e., March 1, 2001, one of Jefferson's

employees telephoned DeGrado and informed him of the denial.  A contemporaneous

note to Jefferson's claims file outlines what was said during that conversation:

> CALLED JOHN BACK, AND ADVISED HIM THAT HIS CLAIM IS
> DENIED.  I ADVISED HIM THAT BASED UPON THE PAYROLL
> RECORDS PROVIDED BY HIS ER, IT APPEARS THAT HE WAS
> WORKING FAIRLY REGULARLY UP UNTIL DECEMBER, AND
> THAT THE MEDICAL RECORDS DURING THAT TIME-FRAME DO
> NOT INDICATE THAT HE WAS TOTALLY DISABLED AND
> UNABLE TO PERFORM THE MAIN DUTIES OF HIS OCCUPATION.
> I ADVISED HIM THAT I CALLED BERNADETTE TO SPEAK WITH
> HIS SUPERVISOR TO INQUIRE INTO THE NUMBER OF HOURS HE
> WORKED, AND SHE TOLD ME THAT THERE WERE A BUNCH OF
> LAYOFFS, AND HIS SUPERVISOR WAS TERMINATED THE DAY
> BEFORE.  JOHN SAID HE KNEW THAT, BUT THAT WHAT WENT
> ON BETWEEN HIM AND HIS SUPERVISOR WAS NO ONE'S
> BUSINESS BUT THEIRS, SO THAT IS WHY BERNADETTE DID NOT
> KNOW ANYTHING, AND SHE WAS TELLING ME THE TRUTH.  I
> ADVISED HIM THAT I UNDERSTAND THAT SHE IS TELLING THE
> TRUTH, BUT IN ADJUDICATING THE CLAIM WE COULD ONLY
> BASE OUR DECISION WITH WHAT WE HAD IN FILE, AND THAT IS
> HOW THE DETERMINATION WAS MADE. * * *  I ADVISED THAT I
> MAILED THE DENIAL LETTER TODAY.  HE ASKED WHAT ELSE
> HE NEEDED.  I ADVISED THAT IF AFTER HE RECEIVES MY
> LETTER, IF HE OR HIS DRS. DISAGREE WITH OUR ASSESSMENT,

OR THINK WE ARE MISSING SOMETHING, TO SUBMIT IT TO US. HE SAID HE WILL, AND <u>THAT HE IS GOING TO HAVE TWO OF HIS SUPERVISORS ALSO WRITE AND EXPLAIN HOW THEY ALLOWED HIM TO WORK WHENEVER HE COULD, FROM HOME,</u> AND THAT HE WAS UNABLE TO WORK BECAUSE OF HIS CONDITION. * * *

Id. at 2438-39 (emphasis added).

Several months later, on July 13, 2001, Jefferson received a letter from DeGrado's attorney outlining DeGrado's position on appeal and stating, in pertinent part:

> In September of 1999 Mr. DeGrado returned to work on a part time basis and in December of 1999 resumed a full time schedule.
>
> Very shortly after returning to full time work, Mr. DeGrado's symptoms reappeared and over time worsened. Although he continued to work, his health problems were readily apparent to his supervisor and co-workers who made various accommodations for him including allowing him to work from home, etc. Again through sheer force of will, Mr. DeGrado persisted until late November 2000 when it became clear both to him and his employer that even with accommodations, he could not fulfill his duties.

Id. at 1812.

Attached to the letter from DeGrado's counsel was an affidavit from DeGrado's former direct supervisor, Rob Falkenberg. Id. at 1170. In the affidavit, Falkenberg stated, in pertinent part:

> I have known John DeGrado since late 1997 and I directly supervised him until April 1999. John returned to work in a part-time capacity in September of 1999 after being off due to disability and in December of 1999 he attempted to return to full time employment. At times John would show up at work looking ill, very pale, lethargic and he was obviously in pain. During this period of time from December 1999 he had frequent absences due to illness or for treatment. I worked directly with John up until July of 2000. I do not have direct knowledge of his work after July of 2000. During the period of time from December of 1999 to July of 2000,

-22-

he was working fewer hours with easier duties but was able to fully perform his main duties. He kept irregular hours and had frequent absences. He did require extra job support. A large portion of his work was sales presentations. He was not required to do heavy lifting or carrying, however, travel was included and he would have to visit personally with clients. He struggled with driving and phone work on a regular and consistent basis.

From 11/99 to 7/00, I was aware of John's difficulties resulting from Crohn's Disease i.e., such as blood in his stool was reported to me and there were times John was stuck at home due to his illness. He was allowed to work at home. He was expected to come in to the office when he could. He consistently reported sickness and fatigue to me.

John's increase in income in the year 2000 was directly attributed to efforts prior to 9/99 and the success of the company earlier. It was not attributed to increased hours in the year 2000. It was rather a residual effect of combined earlier efforts in 1997, 1998 and 1999. I did not notice any personality changes in John. I did notice on many occasions his ability to focus was diminished. His ability to sustain attention and concentration was limited and he would on occasions require additional support or assistance in generating writing and compiling of information for a proposal. Multi-tasking was difficult for him.

In my opinion, John was highly motivated as a worker. A large proportion of his income came from commissions and he made every attempt to take care of himself, however, it became evident that he was limited by physical impairment. In my opinion he is a dedicated, self-motivated individual who does not exaggerate symptoms in any way. After July 2000 I left employment. At that time John was still struggling to maintain employment and his condition had not improved. He fully performed all the main duties of his occupation although he sometimes worked from his house. It was difficult for him to maintain a regular and consistent schedule.

Id. at 1170-71.

On September 7, 2001, while DeGrado's administrative appeal remained pending,

DeGrado filed an application for Social Security benefits, a copy of which was obtained

-23-

by Jefferson for its claims file. In that application, DeGrado acknowledged that his "illnesses, injuries or conditions cause[d] [him] to . . . work fewer hours," "change [his] job duties," and "make . . . job-related changes such as [his] attendance . . . ." Id. at 1175. More specifically, DeGrado explained: "I was unable to work a full 8 hour day for the last year. I was given less responsibility and I worked from home much of the time." Id.

Finally, on November 8, 2001, Jefferson received a letter from one of DeGrado's physicians, Dr. Maria Hopp, stating: "I have been the primary care provider for John DeGrado since December 1988 . . . . He has been disabled from his job as a Sales Manager since November 1999." Id. at 1738.

### III.

After considering all of the evidence outlined above, we conclude that Jefferson has failed to demonstrate that its treatment of DeGrado's disability as "recurrent" was supported by substantial evidence. As noted, Jefferson initially concluded, based upon the evidence available to it as of March 13, 2001, that DeGrado had worked full-time for more than six months after his first period of disability, and that his second claim for disability was therefore considered "new" rather than "recurrent." Although Jefferson thereafter obtained some items of additional evidence that were contrary to this conclusion, the administrative record, considered as a whole, was still conflicting with regard to precisely what DeGrado's working status was during the time period in question. For example, although there were statements from DeGrado and his immediate supervisor indicating that he frequently worked from home, and for less than eight hours

per day, it appears that Sloans Lake's position was that DeGrado performed the essential functions of his position during the period in question, and it was uncontroverted that Sloans Lake treated DeGrado as a full-time employee in terms of pay during the period in question.

Three other factors are also worth mentioning. First, as noted by the district court, Hagemann's letter of December 13, 2001 (awarding DeGrado benefits but treating his claim as "recurrent") failed to explain precisely how Hagemann reached her conclusion that DeGrado did not work full-time for at least six months following his first period of disability. More specifically, there was no indication in that letter (or, for that matter, anywhere else in the administrative file) of precisely how many hours per week that Hagemann concluded DeGrado had worked during the time period in question. Instead, the letter suggests that Hagemann simply reached a general conclusion that DeGrado could not have, due to his physical symptoms, worked the number of hours reflected in his payroll records. Second, the presence of Wharton's comparative benefits calculations certainly calls into question the objectiveness of Jefferson's decision to treat DeGrado's claim as "recurrent" rather than "new," since treating DeGrado's claim as "new" would have greatly increased Jefferson's financial exposure. Third, it is clear from the record that DeGrado was not informed, prior to December 13, 2001, that Jefferson was reconsidering its determination that his claim was "new" rather than "recurrent," and thus there was no opportunity or incentive for DeGrado to submit evidence to Jefferson outlining precisely the number of hours he worked each week during the period in

-25-

question. Further, it is also clear from the record that Hagemann made no attempt to interview DeGrado regarding this matter prior to making her final determination on December 13, 2001.

Having concluded that Jefferson's decision was arbitrary and capricious, our final task is to determine the proper remedy. Generally speaking, when a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it "can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 24 (1st Cir. 2003). Which of these two remedies is proper in a given case, however, depends upon the specific flaws in the plan administrator's decision. In particular, if the plan administrator "fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision," the proper remedy "is to remand the case to the administrator for further findings or explanation." Caldwell v. Life Ins. Co. of North Am., 287 F.3d 1276, 1288 (10th Cir. 2002); see Rekstad v. U.S. Bancorp, No. 05-1146, slip op. at 14-15 (10th Cir. June 21, 2006) (remanding case to plan administrator for examination of relevant evidence in administrative record). In contrast, a retroactive reinstatement of benefits is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant "would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits." Cook, 320 F.3d at 24 (internal quotation marks omitted); see Caldwell, 287 F.3d at 1289 ("A remand for further action is

unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, . . . or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any grounds.") (internal quotation marks omitted); Zervos v. Verizon New York Inc., 277 F.3d 635, 648 (2d Cir. 2002) ("[A] remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable."); Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1163 (9th Cir. 2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.").

Although the district court chose to award DeGrado a retroactive reinstatement of benefits (i.e., to have his claim treated as "new" and to receive the higher monthly benefit amounts under the Policy), we conclude this was an abuse of discretion.[3] See Downie v. Indep. Drivers Ass'n Pension Plan, 934 F.2d 1168, 1170 (10th Cir. 1991) ("We review the application of the district court's equitable remedy for abuse of discretion."). In light of the evidence in the administrative record that we have already discussed, it is apparent that the evidence regarding DeGrado's work status during the time between his two periods of disability was conflicting. In other words, we cannot say that there is no evidence in the record to support Jefferson's decision, or that the evidence so clearly

_____

[3] The district court's selection of this remedy was likely impacted by its erroneous decision to consider evidence outside the administrative record, including an affidavit from DeGrado that outlined, in some detail, the hours he allegedly worked during the time period in question.

points the other way as to make a remand unnecessary. Rather, the flaw in Jefferson's decision is that it failed to make adequate factual findings regarding DeGrado's work status during the time period in question. Thus, the proper remedy is to remand the case to Jefferson so that it can make further findings on this issue. See Caldwell, 287 F.3d at 1288. In doing so, Jefferson is directed to "tak[e] new evidence should [DeGrado] wish to submit the same." Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 32 (1st Cir. 2005).

The judgment of the district court is REVERSED and the case REMANDED to the district court with directions to remand the case to Jefferson for further proceedings consistent with this opinion.