**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VALERIE S. SCHWOB,

  Plaintiff - Appellant,

v.

STANDARD INSURANCE COMPANY,

  Defendant - Appellee.

No. 06-6155
(D. Ct. No. CIV-04-736-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

Plaintiff-Appellant Valerie Schwob filed a lawsuit challenging Defendant-Appellee Standard Insurance Company's decision to apply a mental-disorder limitation to her claim for long-term-disability benefits. She appeals the District Court's order entering judgment in favor of the insurance company based on the administrative record. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM the District Court's order.

## I. BACKGROUND

Beginning in 1995, Dr. Valerie Schwob was eligible through her employment with

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Urocor, Inc., for long-term-disability benefits under a policy (Plan) issued by Standard Insurance Company (Standard). In 1997, Dr. Schwob applied for benefits from Standard, claiming a physical disability resulting from a recurrence of Lyme disease contracted after a tick exposure in 1987. Specifically, she explained that, as a result of cognitive problems resulting from the disease's effect on her central nervous system, she could no longer safely perform her job as a pathologist. In her application, she further explained that the disease had been suppressed and controlled from 1995 to 1997, but was now active and physically debilitating. In support of her claim, three of Dr. Schwob's treating physicians submitted attending physician's statements identifying Lyme disease as the cause of her disability.

Standard subsequently arranged for an independent medical examination of Dr. Schwob. After the doctor conducting the examination concluded that no evidence supported a diagnosis of active Lyme disease, Standard arranged for an independent psychiatric examination with a doctor board-certified in both psychiatry and neurology. This doctor concluded that Dr. Schwob was suffering from major depression and hypochondriasis with poor insight. After inviting Dr. Schwob to submit further information in support of her claim, Standard asked an independent specialist with expertise in Lyme disease to review her file. The specialist found "little if any evidence" of active Lyme disease, expressing the opinion that her debility was likely psychological. Standard then notified Dr. Schwob of its decision to apply the Plan's mental-disorder limitation to her claim. This provision limits the payment of long-term-disability benefits

to twenty-four months "for each period of Disability caused or contributed to by a Mental Disorder." After conducting an independent review, Standard's Quality Assurance Unit confirmed the applicability of this limitation to the claim in September 1999. Consequently, Dr. Schwob no longer qualified for benefits after January 2000.

Dr. Schwob continued to submit materials and medical records from her treating physicians to Standard after receiving notification from Standard's Quality Assurance Unit regarding the limitation of her benefits. In addition to reviewing this information, Standard agreed to reopen the administrative record and reconsider its denial of benefits based on a physical disability.[1] Subsequently, Standard arranged for another independent neuropsychological examination of Dr. Schwob and asked two physician consultants—a board-certified psychiatrist and a board-certified neurologist—to review her file. The findings of the examination and the file reviews supported the conclusion that Dr. Schwob was suffering from a mental disorder and her physical symptoms were not caused by a recurrence of Lyme disease. In March 2003, Standard therefore notified Dr. Schwob that it would uphold its earlier decision applying the mental-disorder limitation to her claim. Four months later, Standard's Quality Assurance Unit informed Dr. Schwob

---

[1] Before Standard's Quality Assurance Unit issued its decision in September 1999, Dr. Schwob filed suit in federal district court challenging Standard's decision to apply the mental-disorder limitation. In September 2000, the district court entered summary judgment in favor of Standard based on the administrative record as it existed in September 1999. But because Standard had agreed to reopen the administrative record, this Court vacated the district court's order after determining that the matter was not yet ripe and the district court therefore lacked subject matter jurisdiction. *Schwob v. Standard Ins. Co.*, 37 F. App'x 465 (10th Cir. 2002) (unpublished opinion).

that its review of her file supported the decision to limit her claim.

Dr. Schwob then sued Standard in federal district court for improper denial of benefits under an employee benefit plan pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B).[2]  In response to Dr. Schwob's motion for summary judgment and Standard's brief supporting its claim determination under ERISA, the District Court entered judgment in favor of Standard.  Dr. Schwob appeals the District Court's order, arguing that the court applied an incorrect standard in reviewing the administrative record and that Standard's decision to limit her benefits is not supported by substantial evidence.

## II. DISCUSSION

We review de novo a district court's decision regarding the appropriate standards of review, as well as its application of the proper standards to a plan administrator's determination of benefits under an employee benefit plan.  *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1167 (10th Cir. 2006).  In addition, when we review decisions concerning ERISA claims, "our review is confined to the administrative record."  *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

In the present case, the employee benefit plan grants Standard discretionary authority as an administrator to interpret the Plan and determine benefit eligibility.  When

---

[2] Both parties agree that Standard's group long-term-disability insurance policy is an employee benefit plan governed by ERISA and that Dr. Schwob is an eligible employee under the Plan.

an employee benefit plan grants the plan administrator or fiduciary discretion to interpret the plan's terms and decide eligibility for benefits, we will uphold the administrator's decision unless it is arbitrary and capricious. *Id.* But because Standard operates under an inherent conflict of interest,[3] we apply a "less deferential arbitrary and capricious standard," which requires that Standard bear the burden of proving the reasonableness of its decision. *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1004–06 (10th Cir. 2004); *see also Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000) ("A basic rule of insurance law provides that the . . . insurer has the burden of showing that a loss falls within an exclusionary clause of the policy."). Specifically, as plan administrator, Standard must show "that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." *Fought*, 379 F.3d at 1006.

To determine whether the administrator's decision is supported by substantial evidence, we look at the record as a whole and consider "whatever in the record fairly detracts from its weight." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (quotation omitted). The evidence is substantial if "a reasonable mind might accept [it] as adequate to support" the administrator's decision. *Id.* (quotation omitted). Moreover, under the less deferential standard, the reviewing court "must take a hard look

---

[3] The parties agree that, as plan administrator and insurer, Standard operates under an inherent conflict of interest. *See Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 n.4 (10th Cir. 2000) ("[A]s both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound.").

at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." *Fought*, 379 F.3d at 1006.

In reviewing the administrative record, the District Court clearly identified and applied this less deferential standard to Standard's decision to limit Dr. Schwob's benefits. Although Dr. Schwob argues that the District Court failed to take the "hard look" at the evidence that this standard requires,[4] our review of the administrative record convinces us otherwise. As we explain below, we agree with the District Court's conclusion that Standard reasonably interpreted and applied the terms of the Plan to Dr. Schwob's claim.

A.     Terms of the Plan

Under Standard's group long-term-disability policy, an eligible employee is not entitled to long-term-disability benefits after twenty-four months if a mental disorder "caused or contributed to" the disability. The relevant provision states:

> Payment of LTD [long-term-disability] Benefits is limited to 24 months for
> each period of Disability caused or contributed to by a Mental Disorder.

---

[4] On appeal, Dr. Schwob argues that the less deferential standard we articulated in *Fought* alters the evidentiary standard in ERISA cases involving a conflict of interest. She contends that the plan administrator must demonstrate that its decision is supported by more than substantial evidence. But while we clarified that the burden of proof *shifts* to the plan administrator, we did not alter the evidentiary standard. Indeed, in applying the less deferential standard in *Fought*, we held that the plan administrator had failed to justify its denial of benefits by substantial evidence. 379 F.3d at 1015. We specifically noted that the administrator had failed to offer "'more than a scintilla of evidence,'" the evidentiary threshold associated with substantial evidence. *Id.* (quoting *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

However, if you are confined in a Hospital at the end of the 24 months, this limitation will not apply while you are continuously confined.

The Plan also contains a lengthy definition of mental disorder:

Mental Disorder means any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause, including any biological or biochemical disorder or imbalance of the brain. Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders.

In July 2003, after concluding that a mental disorder caused or contributed to Dr. Schwob's disability, Standard sent her attorney a detailed letter explaining its final decision to deny her further benefits under the Plan. Assuming a mental disorder caused or contributed to Dr. Schwob's disability, Standard's interpretation of the limitations provision is reasonable. Consequently, the only remaining question is whether substantial evidence in the administrative record supports Standard's determination.

B.     Substantial Evidence

1.     Evidence that Lyme Disease Caused the Disability

Although three of Dr. Schwob's treating physicians submitted statements indicating that her disability was caused by a recurrence of Lyme disease, the majority of evidence in the record does not support a diagnosis of active Lyme disease as the cause of her disability. In addition to seeking an independent medical examination, Standard asked Dr. Sigal, a Lyme disease specialist, to review Dr. Schwob's file. *See Fought*, 379 F.3d at 1015 (stating that when a conflict of interest exists, "the administrator best

promotes the purposes of ERISA by obtaining an independent evaluation"). Dr. Sigal concluded that, although Dr. Schwob may have had Lyme disease in the past, the medical evidence did not indicate the presence of *active* Lyme disease. He specifically noted the absence of the kind of abnormalities he would expect to see in her central nervous system as a result of infections caused by active Lyme disease. He also explained that the tests Dr. Schwob claims are evidence of Lyme disease are not valid diagnostic tests. Although these tests may show patterns compatible with Lyme disease, they cannot be used to diagnose it. Without evidence of a physical disease, he concluded that the evidence best supported a diagnosis of psychologic disorder, noting her "psychologically-based debility is very real."

To determine whether anything in the record "fairly detracts from the weight" of Standard's evidence, we have also thoroughly reviewed medical records and other information submitted by Dr. Schwob. These records do not, however, support a determination that Lyme disease caused her disability. For example, a comprehensive evaluation at the Mayo Clinic in 1990 did not even confirm the initial 1989 diagnosis of Lyme disease. Instead, the report summarizing the doctors' findings states that "the infectious disease people and rheumatologist who saw her [concluded] that a diagnosis of Lyme's disease could not be made and that her symptomatology and history were not consistent with [Lyme disease]." The Mayo Clinic's evaluation therefore undermines Dr. Schwob's claim that she contracted Lyme disease in 1987. Moreover, an evaluation conducted at the University of Iowa Hospitals and Clinics in 1998 found "no evidence of

a serious encephalopathy," a physical complication that can result from Lyme disease and that Dr. Schwob claims contributes to her cognitive impairment. As a result, the neurologist concluded he had "little basis to recommend aggressive antibiotic treatment for CNS Lyme disease." In other words, the University of Iowa doctors found no evidence to support Dr. Schwob's claim that her disability (i.e., her cognitive impairment) resulted from Lyme disease.

In addition, one of Dr. Schwob's treating physicians, Dr. Gondwe, recognized the lack of objective evidence indicating that Lyme disease caused her impairment. In 1998, he made the following notes after seeing Dr. Schwob: "It is very difficult to ascertain the real deficiency of cognitive state in this patient in that all complaints are primarily subjective. There [are] no telltale symptoms that this disease has really caused since she came to see me."[5] Furthermore, he expressed considerable concern that Dr. Schwob insisted she be placed on high doses of antibiotics without any indication of an ongoing infection: "I did try to reason with the patient that I believe there has to be documentation of ongoing infection before we can make this decision. However, she would like to continue with the treatment as long as these *subjective* complaints remain" (emphasis

---

[5] Dr. Gondwe's reservations suggest that he relied on Dr. Schwob's 1989 diagnosis of Lyme disease, rather than objective physical evidence, when he noted a diagnosis of "CNS Lyme disease" on an attending physician's statement submitted to Standard in support of Dr. Schwob's claim. The statement as a whole actually reflects Dr. Gondwe's uncertainty regarding the underlying cause of the disability. In the statement, he indicated that he was waiting for the neurologic and cognitive assessments from the University of Iowa and could not determine her prognosis at that time. As we noted above, the evaluation at the University of Iowa Hospitals and Clinics revealed no evidence of Lyme disease.

added). Dr. Gondwe also noted that another one of Dr. Schwob's treating physicians recommended that she stop the drug treatment for a brief period so that the doctors can better evaluate her symptoms and their causes. She refused, however, to listen to her doctors' recommendations.

The other evidence submitted by Dr. Schwob only supports the conclusion that her symptoms are *compatible with* Lyme disease; this evidence does not support the conclusion that Lyme disease *caused* her disability. For example, she draws our attention to a neuropsychological evaluation conducted by Dr. Tager in 1999. In his report, Dr. Tager noted that she had suffered an overall cognitive decline that "*may* be a direct consequence of Lyme and Babesis infection, fatigue associated with Lyme disease, *and/or* medication side effects" (emphasis added). Similarly, after seeing her a second time in 1999, Dr. Grabowski (from the University of Iowa) noted that "the objective findings to date implicate Lyme disease, and give evidence of a stable encephalopathy, which might reasonably be attributed to the action of Lyme disease at some point in the past." More important, however, he explained that he found "no evidence of active CNS infection at the last visit, and, importantly, there has been no detectable cognitive decline in the interim." In other words, "the evidence of active and/or progressive CNS Lyme disease is not substantial."

Other doctors' reports and medical findings submitted by Dr. Schwob also distinguish between possible Lyme disease in the past and unlikely Lyme disease in the present. For example, after Dr. Schwob complained about Dr. Grabowski's care, Dr.

Damasio (the head of the University of Iowa's Department of Neurology) reviewed her records and concluded: "There is little doubt that you had Lyme's disease . . . . Fortunately you have been appropriately treated with antibiotics and there is no longer evidence of active Lyme's disease." Similarly, after reviewing some of Dr. Schwob's medical records, Dr. Fallon, who directs a Lyme disease research program, concluded that, although the evidence confirmed the Lyme disease diagnosis, she may "not be correct in her assumption that she now has persistent active infection." Hence, after closely reviewing the evidence Dr. Schwob submitted in behalf of her claim, we conclude that the record nonetheless contains substantial evidence supporting Standard's determination that active Lyme disease was not the cause of her disability beginning in 1997. As we explain below, the record does, however, contain substantial evidence that a mental disorder caused or contributed to her disability.

2.  Evidence that a Mental Disorder Caused or Contributed to the Disability

In addition to Dr. Schwob's documented history of depression, the record contains reports from various doctors indicating that she continues to suffer from depression. After Dr. Schwob filed her claim and the independent medical evaluation revealed major depression as a significant feature of her illness, Standard arranged for an independent psychological examination, which resulted in a diagnosis of major depression and hypochondriasis with poor insight. A physician consultant later described this diagnosis as "reasonable." In fact, this physician further characterized Dr. Schwob's mental disorder as "potentially life threatening" and "not sufficiently described by a diagnosis of

- 11 -

depression." In addition, another neuropsychological examination could not rule out psychological causes, leading the doctor to conclude that "negating any possibility of a psychiatric factor to her impairment would be negligent." And as noted above, Dr. Sigal (the Lyme disease specialist) concluded that the evidence best supported a diagnosis of psychologic disorder.

Moreover, medical records from Dr. Schwob's 1998 evaluation at the University of Iowa lend further support to the conclusion that a mental disorder contributed to her cognitive impairment. Dr. Grabowski, a neurologist, concluded that "her cognitive inefficiency seems as likely to be attributable to depression as to mild cerebral dysfunction." A report issued after a neuropsychological evaluation at the university echoes Dr. Grabowski's conclusion:

> Neuropsychological evaluation does not show frank cognitive defects. It is indicative, however, of mild attentional compromise which would be consistent with mild diffuse cerebral dysfunction or, alternatively, reduced cognitive efficiency typical of depression.

The report also contains a strong recommendation that Dr. Schwob be treated for depression: "In addition to neurological treatment as appropriate, pharmacological and psychotherapeutic treatment for depression is strongly recommended." In short, the record contains substantial evidence that a mental disorder contributed to—if not caused—Dr. Schwob's disability.

Furthermore, the medical records Dr. Schwob submitted in support of her claim do not detract from the weight of this evidence. At best, they indicate that a mental disorder,

such as depression, could be secondary to Lyme disease, which she may or may not have. For example, Dr. Tager's neuropsychological examination revealed symptoms "often seen in Lyme disease as well as other diseases affecting the brain and/or central nervous system, including some psychiatric disorders." He then noted that, because Lyme disease can cause both cognitive and psychological difficulties, Dr. Schwob's psychological problems could be secondary to Lyme disease (assuming she has the disease).[6] Dr. Schwob also draws attention to a letter from a doctor who concluded that her SPECT brain scan revealed a pattern "typical of what is seen in patients with Lyme encephalopathy." Although he explained that the particular pattern was not typically associated with "mood disorders," he cautioned that mood disorders can co-exist with physical disorders, such as Lyme disease, as either primary or secondary illnesses. Indeed, Dr. Fallon (the director of a Lyme disease research program) made a similar point in more certain terms: "the brain is the central mediating agent for all neurologic processes, including neuropsychiatric ones, so that patients affected by Lyme disease will have psychiatric issues as well as cognitive, peripheral neurologic, and systemic ones."

This evidence therefore suggests the logical possibility that a mental disorder could result from an underlying physical disease. But this possibility does not detract from the weight of the evidence in support of Standard's decision. First, as we noted

---

[6] In addition, we note that, in Dr. Tager's initial assessment, he reported that Dr. Schwob had "no significant psychiatric history." Because this is not true, we assume he was not aware of Dr. Schwob's full medical history, raising concerns about his ability to reach reliable conclusions.

above, the record contains substantial evidence that a mental disorder contributed to Dr. Schwob's cognitive impairment. A reasonable mind could certainly accept this evidence as adequate support for Standard's decision. *See Caldwell*, 287 F.3d at 1282. Second, even if we accept the premise that Dr. Schwob's mental disorder is secondary to a physical illness, this would not prevent Standard from applying the mental-disorder limitation to her claim. The Plan's definition of mental disorder includes mental disorders "regardless of cause." As long as Dr. Schwob's mental disorder contributed to her disability, the limitation would apply even if the mental disorder resulted from Lyme disease or another physical disease. Standard did not, therefore, have to rule out the possibility that the mental disorder contributing to her disability resulted from an underlying physical disease.

## III. CONCLUSION

Because we find that Standard's decision is supported by substantial evidence, we AFFIRM the District Court's order entering judgment in favor of Standard based on the administrative record.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge